UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BSP SOFTWARE, LLC, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) No. 12 C 2100 |
| MOTIO, INC., | ) ) Magistrate Judge Sidney I. Schenkier ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

In an order dated June 12, 2013 (doc. # 94), the Court, after *in camera* review, held that an email chain identified as Privilege Log Entry No. 712 was not privileged and thus must be produced to defendant, but that four other email chains that had been withheld – Privilege Log Entries Nos. 619, 630, 709 and 710 (which is an exact duplicate of Entry No. 709) – were privileged in the origin. In the motion now before the Court, BSP seeks a ruling that it did not waive the privilege by disclosing the protected material in the four email chains to individuals who made up what BSP refers to as its "advisory board" (doc. # 108). For the reasons that follow, we deny the motion.

I.

The motion and supporting declarations establish that at the time of the emails in question, BSP did not have a formal board of directors. Rather, BSP (through an officer of the company, Andrew Rachmiel) assembled a group of four persons to act as an advisory board. (Rachmiel Decl. ¶ 2). The four persons were selected based on their "long-standing relationships and years of familiarity" with BSP – one of them, for example, was Mr. Rachmiel's boss and

mentor during previous employment (*Id.* ¶ 4). Mr. Rachmiel says there was no need for a written agreement delineating the functions of the advisory board because, in light of the relationships he had with the four individuals, a "handshake agreement was stronger than anything that could have been reduced to writing" (*Id.* ¶ 4). One of the individuals is an attorney (Graham Decl. ¶ 1), but BSP does not assert that this individual was providing legal advice in any of the particular email chains at issue, or that the advisory board provided legal advice more generally.[1] To the contrary, BSP asserts that the mission of the board was to "impart business and financial advice" (Rachmiel Decl. ¶ 3). BSP's submissions show that the members of the advisory board understood their communications with BSP to be confidential, and treated them in that manner (Pl.'s Mot. at 2-3).

While BSP states that the four persons were "retained" to serve this informal function (Rachmiel Decl. ¶ 2), BSP does not assert that these individuals were employed by the company or paid for their services. Moreover, while BSP says that these individuals assisted Mr. Rachmiel in "chart[ing] the course that took BSP from a startup to an industry leader, BSP concedes that these individuals possessed "no binding authority over Mr. Rachmiel and the other owners of BSP" (Pl.'s Mot. at 2).

Turning to the emails in question, BSP states that it disclosed certain privileged information from BSP's counsel to the advisory board in order to get its "business and financial advice . . . in determining whether to file suit against Motio" (Pl.'s Mot. at 3). Mr. Rachmiel says that this advice was "central to BSP's pre-litigation decision-making" about whether "to

---

[1] BSP has disclosed that the attorney on the advisory board (Douglas Graham) worked for the law firm with which I was a partner before becoming a judge, and worked with me on various matters while we were at the firm together (Pl.'s Mot. at 1 n.1). No one asserts that this professional relationship that existed before I joined the Court on October 30, 1998 creates any conflict.

2

pursue litigation or continue to allow BSP's biggest competitor to abuse its intellectual property" (Pl.'s Mot. at 3 and Rachmiel Decl. ¶ 7).

## II.

The attorney-client privilege serves a central purpose in our system of justice, by fostering "full and frank communication between attorneys and their clients and thereby promot[ing] broader public interests in the observance of law and administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981). But the benefit of the privilege is not cost free. As the Seventh Circuit has observed, "[w]hen the privilege shelters important knowledge, accuracy declines. Litigants may use secrecy to cover up machinations, to get around the law instead of complying with it. Secrecy is useful to the extent it facilitates the candor necessary to obtain legal advice. The privilege extends no further." *In re Feldberg*, 862 F.2d 622, 627 (7th Cir. 1988). Thus, because "the privilege is in derogation of the search for the truth . . ., [it] must be strictly confined." *In re Grand Jury Proceedings*, 220 F.3d 568, 571 (7th Cir. 2000).

One of the limitations on the exercise of the privilege is the recognition that it may be waived. As we have observed in the past, "[p]erhaps the most common instance of waiver is where an otherwise privileged communication is disclosed to a third party outside the scope of the privilege." *Beneficial Franchise Co. v. Bank One, N.A.*, 205 F.R.D. 212, 215 (N.D. Ill. 2001). In this case, Motio contends that BSP waived the privilege in the attorney-client communications by sharing them with the members of the advisory board. BSP has raised a number of arguments in support of its position that there has been no waiver. We have considered those arguments, and find them unavailing.

3

## A.

BSP argues that sharing the privileged information with the advisory board did not waive the privilege any more than would sharing privileged information with a duly constituted board of directors (Pl.'s Mot. at 5-6). This at bottom is an argument that, for purposes of the attorney-client privilege, the advisory board should be treated as the functional equivalent of a formal board of directors. However, BSP ignores that this "functional equivalent" test has never been adopted by the Seventh Circuit, and has been treated skeptically by trial courts in this district. *See, e.g., LG Electronics U.S.A., Inc. v. Whirlpool Corp.*, 661 F. Supp. 2d 958, 963 (N.D. Ill. 2009) (collecting cases). We likewise doubt the wisdom of adopting the functional equivalent test in this case for two reasons.

*First*, application of the test would increase the uncertainty on the important question of when disclosure to non-employees who comprise an advisory board would waive the privilege. The cases that endorse the functional equivalent test apply a multi-factor analysis to determine whether that test has been met: (1) "whether the consultant had primary responsibility for a key corporate job," (2) "whether there was a continuous and close working relationship between the consultant and the company's principals on matters critical to the company's position in litigation," and (3) "whether the consultant is likely to possess information possessed by no one else at the company." *LG Electronics*, 661 F.3d at 963 (quoting *Export-Import Bank v. Asia Pulp & Paper Co.*, 232 F.R.D. 103, 113 (S.D.N.Y. 2005)). But, adoption of a test does not foreordain the results that test will yield when applied to concrete cases. The functional equivalent test as applied by courts requires the proponent to make "a detailed factual showing." *A.H. v. Evenflo Co., Inc.*, No. 10-cv-02435, 2012 WL 1957302, at *4 (D. Colo. May 31, 2012). We note that in *Asia Pulp*, the court rejected the claim that a consultant was the functional

equivalent of an employee. In other instances, use of that test has resulted in the privilege being upheld. *See, e.g., Evenflo*, 2012 WL 1957302, at *5. Adopting the functional equivalent test would blur the line between privilege and waiver, complicating the decision about whether to disclose privileged information to a third party.

It would not be productive to increase the level of uncertainty about whether a communication with a third party – such as BSP's advisory board here – would waive the privilege. Nor do we see the need to do employ a functional equivalent test when a corporation such as BSP could create a formal board of directors to fulfill what Mr. Rachmiel describes as the "central" function of deciding whether to pursue litigation, and vest that board with the authority to make that decision and not merely offer non-binding advice.

*Second*, we are concerned that over time, the application of the functional equivalent test could expand the scope of the privilege by eroding the circumstances in which it can be waived. The *Asia Pulp* court adopted the multi-factor test in an effort to address that concern: "[i]f the functional equivalent doctrine were extended to every situation where a financial consultant worked exhaustively to guide a company through a restructuring deal, the exception would swallow the basic rule." 232 F.R.D. at 114. However, even the most well-structured test may falter in the application. We are doubtful that the Seventh Circuit would endorse this test, which has the potential to expand the privilege dramatically and thus would run contrary to the Seventh Circuit's frequent admonition that the scope of the privilege must be carefully circumscribed. *See, e.g., In re Grand Jury Proceedings*, 220 F.3d at 571.

We therefore will not adopt that test in deciding BSP's motion. As a result, the cases that BSP cites for the proposition that we should equate BSP's advisory board with a formal board of

directors are inapposite. Those cases either turn on the acceptance of the functional equivalent theory that we do not endorse, *Evenflo*, 2012 WL 1957302, at *4 (a diversity case applying Colorado law of privilege, in which the court stated that the Colorado Supreme Court had favorably cited the functional equivalent test), or address the question of waiver where privileged information was presented to a formal board which possessed actual decision making authority and exercised that authority by making a decision. *Sandholm v. Dixon Pub. Sch. Dist. No. 170*, No. 09 C 50119, 2010 U.S. Dist. LEXIS 101081, at *1 (N.D. Ill. Sept. 24, 2010).

That said, we note that even if we were to apply the functional equivalent test as formulated in *Asia Pulp*, we would find that BSP waived the privilege when it disclosed privileged information to its "advisory board." BSP's submissions show that there was a "continuous and close working relationship" with the "advisory board," which is a portion of the second factor of the *Asia Pulp* test. But, BSP's submissions fail to show that that working relationship was on matters "critical to the company's position in litigation." *Asia Pulp*, 232 F.R.D. at 113. To the contrary, BSP's submissions show that the advice it received from the advisory board was for business and financial matters, and not litigation.

Moreover, BSP falls far short of showing that the advisory board meets the other two factors of the *Asia Pulp* test. Unlike a real board of directors, the advisory board had no decision making authority or "primary responsibility for a key corporate job." *Asia Pulp*, 232 F.R.D. at 113. Moreover, BSP has not offered any evidence that the advisory board possessed information that no one else at BSP would possess. *Id.* The four persons who comprised that advisory board were simply people whose opinions Mr. Rachmiel valued and trusted, akin to a "kitchen cabinet" of trusted friends and associates to whom many presidents over the years have resorted for

advice. Even under the functional equivalent test, BSP's advisory board would not fall within the scope of the privilege.

**B.**

BSP's other arguments in support of its position that the privilege has not been waived fare no better. We address them briefly.

*First*, BSP argues that a communication does not lose its status as privileged if it is conveyed to another "who shares responsibility for the subject matter underlying the consultation" (Pl.'s Mot. at 4, quoting *Kodish v. Oakbrook Terrace Fire Prot. Dist.*, 235 F.R.D. 447, 453 (N.D. Ill. 2006). That statement, while true as a general proposition, has no footing here. BSP has offered no evidence that the advisory board" shared responsibility with Mr. Rachmiel or others in charge at BSP for deciding whether to commence litigation against Motio. To the contrary, as BSP concedes (Pl's Mot. at 2), the advisory board had no binding authority over Mr. Rachmiel. The "advisory board," true to its name, gave its advice; but it was Mr. Rachmiel and others at BSP who were responsible for making the decisions.

*Second*, BSP argues that the privilege has not been waived because BSP management and the advisory board members had a mutual understanding about the purpose of the advisory board and "commonality of interest" (Pl.'s Mot. at 5-6). We fail to see how a "common understanding" about the function of the advisory board averts a waiver, where the structure and the function of the advisory board are – as we have explained – insufficient to bring it within the scope of the privilege. And, if the unelaborated reference to "commonality of interest" is an attempt to invoke the common interest doctrine, BSP has fallen woefully short of showing that doctrine applies here. To be sure, disclosure to a third party does not waive the privilege where

7

the parties are linked by a common interest. *Beneficial*, 205 F.R.D. at 215. However, for that exception to waiver to apply, BSP would have to show that it had a common interest with the advisory board that "relate[s] to a litigation interest, and not merely a common business interest." *Id.* at 216. BSP's submissions establish precisely the contrary. BSP went to the advisory board to get its business advice.

*Third*, BSP argues that the advisory board understood the communications it received were made in confidence and treated them as such (Pl.'s Mot. at 6-7). We accept that representation, but find that it does not alter our conclusion. Confidentiality alone is not sufficient to establish the privilege or to avoid waiving it by disclosure to a third party. We also must consider, among other things, to whom the disclosure was made. For example, if Mr. Rachmiel disclosed privileged BSP information to a respected third-party who had been giving a business lecture at a seminar on the wisdom *vel non* of pursuing patent litigation, all of the assurances of confidentiality in the world would not avert a waiver. Likewise, if a disclosure is made (as here) to persons outside the scope of the privilege, a promise of confidentiality is not an elixir that cures the ill of waiver.

*Fourth*, BSP argues that we should consider in the calculus that the privileged information that BSP communicated to the advisory board was limited to that which was necessary to facilitate its role of providing business and financial advice (Pl.'s Mot. at 7-8). We disagree that this consideration averts the waiver we have found. But, we do find that this consideration is relevant to the extent of the waiver. The circumstances of the disclosure show that BSP did not disclose privileged information to its advisory board with the intent to waive the privilege, or to use that privileged information affirmatively against Motio. That fact, along with the limited nature of the disclosure, shows that the waiver should extend only to the four emails

provided to the advisory board and that a broader subject matter waiver should not apply. *See* Fed. R. Evid. 502 (a). We note that Motio seeks only production of these four emails and has not asserted that there has been a subject matter waiver, but we nonetheless make this point to give the parties direction and to avoid further motion practice.

## CONCLUSION

For the foregoing reasons, we deny plaintiff's motion for protective order (doc. # 108). By July 23, 2013, plaintiff shall produce to defendant the withheld documents labeled as Privilege Log Entries Nos. 619, 630, 709 and 710.

**ENTER:**

_____
**SIDNEY I. SCHENKIER**
**United States Magistrate Judge**

DATED: July 9, 2013