# EXHIBIT

# A

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

In re Patent Application of:  Andrew D. Weiss et al.

Application No.:  12/841,975

Confirmation No.:  3122

Filed:  July 22, 2010

For:  Integrated Change Management in a
      Business Intelligence Environment

Customer No.:  58898

Docket No.:  10126-09 BSP-03A

Art Unit:  2169

Examiner:  Jensen Hu

**DECLARATION OF INVENTORS UNDER 37 C.F.R. §1.131**

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Sir:

      We, Andrew D. Weiss and Andrew G. Rachmiel, hereby state as follows:

      1.     I am a joint inventor of the invention claimed in the above-identified patent application ("the present application").

      2.     I have been an employee or member of BSP Software LLC, the assignee of the present application ("BSP Software"), or its affiliate, BrightStar Partners, Inc., throughout the development of the claimed invention.  I am presently a member of BSP Software.

      3.     I am familiar with the prosecution history of the present application, including the claim rejections citing Needamangala et al. U.S. Patent Publication No. 2009/0249368, which was based on an application filed on March 25, 2008 ("the Effective Date").

      4.     I make this declaration for the purpose of providing evidence regarding (i) the conception of the claimed subject matter before the Effective Date, and (ii) the diligence of BSP Software to reduce the claimed invention to practice.

5.     Our conception of the claimed subject matter before the Effective Date is evidenced by an Instant Messenger (IM) chat session during which we discussed the product development plans of BSP Software.  The date of the chat session preceded the effective date.  The substance of the chat session was recorded in a chat log by the Microsoft Windows Live™ Messenger service as XML data, an excerpt of which has been arranged in a tab-delimited table attached as Exhibit A.  The table has columns dedicated to transmission time, sender, recipient, and narrative.  The leftmost column of the table is dedicated to indicating the respective date on which each instant message was sent, but has been redacted.

6.     Several of the instant messages address the integration of version control functionality into Cognos (please see the messages with highlighted narrative text).  For example, one message refers to "versioning reports that authors make" (6:14:55 PM), while another message notes that IBM Cognos does not provide this functionality (6:16:04 PM).  Each instant message addressing version control occurred on the same date before the Effective Date.

7.     The chat log includes messages that address "putting version control into Cognos Connection" (6:17:22 PM) and making the functionality "available to all users" (6:16:49 PM).  The following message in the chat log recalls that a "portal tab utility" added a link and an icon to the Cognos Connection portal interface (6:19:35).  The utility was created by BrightStar Partners, Inc., and called "My Pages Copy."

8.     Further discussion of how to achieve version control was tabled until a product development meeting, a "roadmap meeting" (6:37:56 PM), scheduled for two days later on a date also before the Effective Date.

9.     We discussed the following topics at the product roadmap meeting:

   I.  Software development team members and roles;

   II.  MetaManager software product status;

   III.  Future plans for MetaManager software product;

   IV.  MyPages Copy software utility; and,

   V.  Integration of version control features into Cognos web environment.

10.     During the roadmap meeting, one of us, Mr. Andrew D. Weiss, was declared the new lead product developer of the software development team for BSP Software.  Mr. Weiss and one other individual were then assigned with the duties of maintaining and continuing the

development of current BSP software products, as well as the responsibility for developing new products. They were the only two individuals at BSP Software assigned with these software developer tasks and responsibilities.

11. It was decided at the roadmap meeting that one of the current software products, MetaManager, required immediate attention to address customer demands and other feedback. It was also noted that both software developers needed time to become familiar with the MetaManager code before undertaking these tasks.

12. It was also decided at the roadmap meeting that future development of the MetaManager software product would require preliminary efforts to (i) implement code management practices and (ii) clean the code so that multiple developers could work on the code simultaneously.

13. Our next topic at the roadmap meeting was the MyPages Copy utility that modified the Cognos Connection portal interface. We reviewed how a link and an icon were incorporated into the interface so that a user could access the functionality of the utility. One of the Cognos server instruction files, system.xml, was modified to incorporate the link and the icon.

14. When a user selected the link, the browser presenting the Cognos Connection portal interface generated a display screen of the MyPages Copy utility. The display screen allowed users to create custom pages for the Cognos Connection portal.

15. The display screen was not integrated into the Cognos Connection interface. The display screen was instead a discrete website separate from the Cognos Connection interface.

16. The system.xml file is a server-side instruction set that the Cognos application server runs to configure the Cognos application. The instruction set is not passed to the browser or otherwise implemented on the client side.

17. The MyPages Copy utility was reviewed during the roadmap meeting to determine if there would be a way to integrate a version control solution into Cognos, rather than just a link to a separate website.

18. We then recognized during the roadmap meeting that we could integrate version control functionality by modifying the XML and other browser textual instruction files of Cognos that are passed to the client browser. Unlike the server-side system.xml file, these

- 3 -

instruction files define the actions taken by the client browser when buttons in the Cognos interface are selected as a user is authoring a report or other Cognos content. We recognized that a function call in a Cognos browser textual instruction file could reference further browser textual instructions designed to modify a Cognos authoring user interface, such as Report Studio, in a manner that integrates version control functionality into the user interface.

19. The software development tasks identified for the team were then prioritized at the meeting. The modifications of the browser instructions and other development of the version control solution were scheduled to begin once the software development team was familiar with MetaManager, MetaManager feedback was addressed, and code management practices were put in place.

20. The development of the version control solution resumed in earnest by mid-2008, within a few months of the roadmap meeting, as a result of the assiduous work of the development team to complete the other tasks.

21. It took a considerable amount of effort to modify the Cognos browser textual instructions to include all of the references to the version control browser textual instructions. The modifications required an arduous examination of each Cognos browser textual instruction file to locate and identify the various functions of the authoring user interface. For example, the name of the function responsible for implementing the save operation of the Report Studio user interface did not include the term "save." Instead, the function names were randomized, thus requiring a significant amount of decoding.

22. A beta version of the version control solution was in the midst of testing by December 29, 2008, as evidenced by the attached e-mail message, portions of which have been redacted (Exhibit B). The e-mail message identifies the version control solution for the recipient, a customer, as "Integrated Content Manager" in connection with an upcoming release.

23. The beta version of the version control solution integrated several change management features into the authoring studios of Cognos. For example, the behavior of the save operation of the Report Studio user interface was modified through browser textual instructions referenced by a function call in the browser textual instructions implemented when a user selected the save operation. In this way, execution of the save operation would seamlessly

cause change management functionality to be implemented, including the storage of a version of the report definition in a version control repository.

24.     The customer began testing the solution shortly after the reference to the beta version. The customer provided feedback on the "versioning functionality" via an e-mail dated February 4, 2009: "This is what I would call Versioning for Cognos. Nothing else I've seen or tested is anywhere near as functional or seamless." A redacted copy of the email is attached as Exhibit C.

25.     I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. §1001 and that such willful false statements may jeopardize the validity of the above-referenced patent application and any patent issued therefrom.

Date: _January 18, 2011_          By _____
                                     Andrew D. Weiss

Date: _January 18, 2011_          By _____
                                     Andrew G. Rachmiel

EXHIBIT A

| | | | |
|---|---|---|---|
| 10:29:16 AM | Andrew | Andy | I'm at home. ████████ ok |
| 10:46:04 AM | Andy | Andrew | any of these near you? |
| 10:46:04 AM | Andy | Andrew | http://offices.regus.com/search/results.htm?link=FND-SEA-8UT&grp=OFF |
| 10:46:57 AM | Andrew | Andy | session timed out  what were you searching, virtual offices? |
| 10:47:13 AM | Andy | Andrew | yip. go to www.regus.com |
| 10:48:05 AM | Andrew | Andy | you know I just spent a week building a room... stud walls, sheetrock, spackle, paint, electric, the works... |
| 10:48:15 AM | Andrew | Andy | I'll send you pictures in a few. |
| 10:49:19 AM | Andy | Andrew | so you don't need an offsite location, correct? |
| 10:49:56 AM | Andrew | Andy | not unless you start hiring more developers in NJ and I get to be the Michael Scott of the Hazlet branch! |
| 10:50:18 AM | Andrew | Andy | Or if we need to rent a meeting room for some reason |
| 10:51:01 AM | Andy | Andrew | :D |
| 10:51:02 AM | Andy | Andrew | k |
| 10:51:05 AM | Andy | Andrew | nevermind |
| 10:51:29 AM | Andrew | Andy | But this is good to know about. New Jersey, Red Bank - Red Bank (HQ) |
| 10:51:45 AM | Andrew | Andy | This one is the closest, I actually looked at it on a weekend, nobody was around. |
| 10:53:54 AM | Andrew | Andy | you only get to work in it 40 hours a month! These people don't work do they... |
| 1:54:44 PM | Andrew | Andy | It's going to be funny when Godfrey see my name on that CC list. :) |
| 1:55:39 PM | Andrew | Andy | Are you busy? I'm putting together an email for you, but it would be easier to chat if you have a few. |
| 1:55:39 PM | Andy | Andrew | huh? |
| 1:56:04 PM | Andy | Andrew | oh. yeah. i'm jumping onto a conf call... demo time |
| 1:56:19 PM | Andrew | Andy | ok. I'll send you the email  we'll talk later |
| 1:56:29 PM | Andy | Andrew | k |
| 6:03:15 PM | Andy | Andrew | I see you made it back. |
| 6:03:47 PM | Andrew | Andy | Just got back and wanted to make sure VPN was working from the NJ office ;) |
| 6:04:15 PM | Andy | Andrew | I'm glad you and Munson hit it off. He's really bright |
| 6:04:38 PM | Andrew | Andy | I like Dave. We'll work well together |
| 6:06:22 PM | Andy | Andrew | So this morning we had a demo where the company asked us about all the changes tht we make and how we record them. |
| 6:07:11 PM | Andrew | Andy | Do you mean how they are logged |
| 6:07:14 PM | Andy | Andrew | when we change something and make a mistake |
| 6:07:57 PM | Andy | Andrew | No, not logging. capturing the changes so we can recover. I showed them the Transaction Mgr that details the changes and lets you revert |
| 6:08:12 PM | Andrew | Andy | exactly |
| 6:08:57 PM | Andy | Andrew | BRB |
| 6:14:55 PM | Andy | Andrew | that will definitely work (trans mgr), but that only captures changes made with MM. we were talking about versioning reports that authors make. |
| 6:15:42 PM | Andrew | Andy | does cognos have versioning in their products |
| 6:16:04 PM | Andy | Andrew | no. you can version the FM files pretty easily. The problem is that reports aren't files. theyre stored in the content store. |
| 6:16:49 PM | Andrew | Andy | we could make a module in metamanager but then only metamanager users could recover versions. it has to be available to all users, or at least more than just developers |
| 6:16:58 PM | Andy | Andrew | how do we do that |
| 6:17:22 PM | Andrew | Andy | There has to be a way of putting version control into Cognos connection |
| 6:19:35 PM | Andy | Andrew | I know you can customize themes and colors. Darek played with adding a link and icon when we did that portal tab distribution utility he wrote. we added an icon to the top of cognos connection with a link to a page we created that manages portal pages. pretty cool actually! |
| 6:22:02 PM | Andrew | Andy | back in a minute. sarah needs something |
| 6:22:14 PM | Andy | Andrew | take your time |
| 6:37:56 PM | Andrew | Andy | lets put it on the list for our roadmap meeting Friday. |
| 6:38:32 PM | Andy | Andrew | we should look at the utility darek built to see how he did it |
| 6:38:49 PM | Andrew | Andy | yeah. let me look at the code. |
| 6:40:03 PM | Andy | Andrew | awesome. MM is starting to sell. looks like our product group is taking off!! |
| 6:40:18 PM | Andrew | Andy | ;) have a good night |
| 6:40:26 PM | Andy | Andrew | you too! |

EXHIBIT B

## Andy Rachmiel

**From:** Andy Rachmiel
**Sent:** Monday, December 29, 2008 10:06 AM
**To:** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬
**Cc:**
**Subject:** Thank you for your purchase

▬▬▬▬▬▬▬▬▬▬

Thank you for your purchase! Please take a moment to visit our support site at https://www.thinkbsp.com/support/, where you can create a login and password that allows you to access product downloads, to log support issues, to provide enhancement requests, and to access product updates. Note that you will have to register for an account when you visit our support site for the first time, and once the account has been validated, you will be able to access the support site.

**MetaManager**
Your serial number is: ▬▬▬▬▬▬▬▬▬▬▬▬▬ The download and Quick Start training for MetaManager can be found at **Support Center » Downloads » MetaManager**. Note that this is still linked to the 2.3 GA version of MetaManager, as 3.0 has not been "officially" released. You do have the option of downloaded MetaManager 3.0 at this time, and it can be found here. The documentation for 3.0 is not yet complete, but the currently available docs are here. We have also made the MetaManager demo recording available for you to view at www.bspsoftware.com/MM3recording3.0/MetaManager3.php.

**CPM Explorer**
As a courtesy to you and as part of our End of Year Promotion, we have also included with your purchase 2 licenses of our CPM Explorer product. You can find out more and watch the recording of CPM Explorer at http://www.bspsoftware.com/products/cpmexplorer.php. Your serial number for CPM Explorer is: ▬▬▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬ The download for CPM Explorer can be found at **Support Center » Downloads » CPM Explorer** and we have made a video recording available for you at http://www.bspsoftware.com/CPMExrecording2.0/CPMExplorerDemonstration.php.

**Content Extractor**
You can find the download for the Content Extractor utility at **Support Center » Downloads » BSP Content Extractor**. This download has a password of bspforme.

**Scheduled Email Extractor**
You can find the download for the Scheduled Email Extractor utility at **Support Center » Downloads » Scheduled Email Extractor**. This download has a password of b$pemail.

**Integrated Content Manager**
As we discussed previously, the ICM product is still in beta testing for the 1.0 GA release. We will have information on the download for this product shortly. Stay tuned…

Your name and e-mail address are automatically entered into our preferred customer database so that we can contact you for the upgrades/updates to which you are entitled. We respect your privacy and will not share your information with anyone.

You may obtain technical support for this product or service at https://www.thinkbsp.com/support/ or support@bspsoftware.com.

Thank you again for your business!

**Andy Rachmiel | BrightStar Partners, Inc. |** www.brightstarpartners.com **| ☎:** ▮▮▮▮▮▮▮▮ **| ✉:** ▮▮▮▮▮▮▮▮
✎: Continental Towers | 1701 W. Golf Road Tower III, Suite 604 | Rolling Meadows, IL 60008

*The information contained in this electronic document is considered a confidential and/or privileged communication between BrightStar Partners and the recipient. This information is intended to be reviewed by only the individual(s) named as "recipient" or their representative(s). Review by persons other than the recipient is prohibited. Likewise, dissemination or copying of this email or the information contained herein to persons other than the recipient is also prohibited. If you have received this message in error, please notify the sender by telephone immediately or reply to the sender of this message at the address shown above. Thank you!*

EXHIBIT C

**From:** ▬▬▬▬▬▬
**To:** Andrew Weiss;
**Subject:** IVC thoughts
**Date:** Wednesday, February 04, 2009 8:41:33 PM

Hi Andy,

This looks really good.  I haven't given it a full hard test, but I like the separation of non-comment and comment saves.  So far, all the compare routines and previews are working well.

There are two things that I think would help.

1. A "Recycle Bin" for managing orphaned or purposely deleted versions of reports/queries/analsys objects. It'd be neat if it was under the launch menu or was a folder in the main public folders area that could be secured.  Maybe with just a simple "Restore to" ability? Pick a report and make it the latest version or give it a new folder and report name OR permenantly delete.
2. The ability to supply mass new versions with comments.  This could be a simple option on the Congos Connection toolbar, probably in the properties / Order button area.

That to me would round out the versioning functionality quite well. Functionality I see source control tools have out of the box (other than what we have now) have to do with branching and tagging. Branching doesn't make any sense for reports.  The mass-comment option would take care of tagging. Recycle bin (some source control tools call it an Attic) would let you see and manage deleted or orphaned stuff.

Of course, this would be without getting crazy with securing version capabilities (like removing delete and update comment functions for certain users), check-in/check-out, etc...  That all needs binding to the LDAP structures or Cognos security which is WAY over the top.

Just some free thinking going on.  I'll hit this real hard on Saturday and give you some good testing feedback.

Lookin sweet!  It's nice... just set it and forget it.  No muss, no fuss. Very valuable!!  This is what I would call Versioning for Cognos.  Nothing else I've seen or tested is anywhere near as functional and seamless.

Thanks,



# EXHIBIT

# B

## Drake, Jeffrey M.

| | |
|---|---|
| **From:** | Drake, Jeffrey M. |
| **Sent:** | Monday, June 03, 2013 10:39 |
| **To:** | 'SKaspar@foley.com' |
| **Cc:** | BOST-File-BSP-Motio-12-02100@foley.com; 'Kelly J. Kubasta'; Todd Basile |
| **Subject:** | BSP v. Motio |

Counsel-

It has come to Motio's attention that BSP has not produced any instant messaging (IM) logs in response to Motio's Document Requests.

Please let us know when you are available today or tomorrow to meet and confer on this issue.

Jeffrey

---

**Jeffrey M. Drake** | Attorney and Counselor at Law
**Miller Canfield**
225 W. Washington, Suite 2600
Chicago, Illinois 60606 (USA)
**T** +1.312.460.4234 | **F** +1.312.460.4201
drakej@millercanfield.com | View Profile + VCard

---

This electronic message and all of its contents and attachments contain information from the law firm of Miller, Canfield, Paddock and Stone, P.L.C. which may be privileged, confidential or otherwise protected from disclosure.  The information is intended to be for the addressee only.  If you are not the addressee, then any disclosure, copying, distribution or use of this message, or its contents or any of its attachments, is prohibited.  If you have received this electronic message in error, please notify us immediately and destroy the original message and all copies.

# EXHIBIT

# C

**Drake, Jeffrey M.**

| | |
|---|---|
| **From:** | RRodrigues@foley.com |
| **Sent:** | Tuesday, June 04, 2013 11:16 |
| **To:** | Drake, Jeffrey M.; SKaspar@foley.com |
| **Cc:** | BOST-File-BSP-Motio-12-02100@foley.com; 'Kelly J. Kubasta'; Todd Basile; Williams, Ryan C. |
| **Subject:** | RE: BSP v. Motio: June 5 Status Hearing |

Hi Jeffrey,

See below with regards to the issues you raised.  Please also note the issues BSP intends to raise, along with a request for a meet and confer on these issues, provided below:

   1. a.) We have repeatedly explained our position with regards to Entry Nos. 619, 630, 709, 710 and 712 on BSP's privilege log.  These communications were made in furtherance of an investigation with attorney Chris Braidwood and BSP considers them privileged considering the Advisory Board's managerial role.

   1. b.) The inclusion of Gerald.D@GMail.com on BSP's privilege log is a result of the extremely broad search terms that Motio requested in conjunction with BSP's ESI production.  As an initial matter, these documents are completely irrelevant to the issues in this case, and Motio is not entitled to discovery regardless of privilege.  However, these document are additionally privileged communications relating to the legal advice of Attorney Chris Braidwood, who was retained as counsel for both BSP and Mr. Gerald Donovan in conjunction with a prospective joint venture (that again, has nothing to do with Motio or the issues in this case).

   1. c.) We don't quite understand the basis for your request for production of documents that are "purely internal" to BSP.  For any such "internal" communication we have identified the attorney at issue in the "Priv Log Narrative" column of the privilege log, which is more than Motio has done with regards to the "purely internal" communications on its own privilege log.  Is Motio taking the position that any internal communication pertaining to legal advice of counsel, but that does not specifically include an attorney on the To, From, or CC line is not privileged?  If so, please identify the legal basis for such a contention.

   2. With regards to the production of IM Chat logs, we note that Motio also has not produced chat logs apart from those that appear to have been copied-and-pasted into e-mail communications that were eventually produced.  BSP requests that Motio produce all relevant and responsive IM Chat logs, to the extent they exist.  BSP utilizes the Windows Live Messenger service for IM conversations.  We understand that, by default, chat logging is not turned on in Windows Live Messenger and the BSP's custodians have not otherwise changed those settings.  As such, there are no IM Chat logs for BSP to produce.  We expect that this will settle Motio's concern.

   3. In an effort to streamline the issues, and in view of a more finalized availability schedule on our end, we will agree to make Mr. Rachmiel available for deposition as a 30(b)(1) witness prior to BSP's 30(b)(6) deposition on the dates previously discussed.

   4.  Motio has not provided sufficient information on which BSP can properly assess this request.  For example, who are the 14 additional deponents from which Motio seeks additional discovery?  What is Motio's supposed justification for seeking this discovery 3 weeks prior to the close of fact discovery? Regardless, BSP does not agree to Motio's belated request, which is little more than an attempt to extend discovery for a third time.  The discovery period has already been extended twice, and has lasted for more than a full year (with initial disclosures exchanged in April 24, 2012).  We see no reason to accommodate Motio's unjustified and inexplicable delay in seeking discovery from a whopping 14 unidentified witnesses. Furthermore, your request is contrary to the parties agreement (reflected in the Joint 26(f) report filed on May 10, 2012), adopted and entered by Judge Lefkow on May 15, 2012, limiting each party to 10 factual depositions.  Additionally, Motio prepared and served final invalidity contentions in this matter on January 25th, more than four months ago, to which BSP responded on February 22, more than three months ago.  Not only has Motio been aware of BSP's arguments for more than three months (indeed much longer considering that there were few changes between Motio's initial and final contentions), but, as I'm sure you're aware, it is Motio's burden to prove invalidity.  BSP's

arguments have no relevance as to the deficiency of Motio's final invalidity contentions, which Motio is apparently now trying to supplement.

Additionally, BSP intends to raise the following issues with the Court at the June 5th Status hearing:

1. **Motio's Improper Subpoenas to Canadian Residents.** We are in receipt of Motio's improper and utterly ineffective subpoenas to Mr. Darren Nelson and APOS, both resident of Canada whom Motio has served via e-mail. As you are likely aware, the Northern District of Illinois lacks subpoena power over Canadian residents such as Mr. Nelson and APOS, and the subpoenas that were served have no plausible legal effect. We intend to move to quash these subpoenas, and seek all fees and costs associated with said motion, if Motio does not immediately withdraw these subpoenas and inform Mr. Nelson and APOS of their withdrawal. Please advise if you are available for a meet and confer on this issue today.

2. **Motio's Deficient Notice of Deposition on Written Questions.** Motio included a schedule with it's improper subpoena to APOS comprising a list of questions pursuant to a purported "Deposition on Written Questions". However, Motio has failed to notice this deposition in accordance with the requirements of Federal Rule 31(3), including a failure to identify an Officer before whom the deposition will be taken. BSP expects that Motio will immediately withdraw this schedule. Please advise if you are available for a meet and confer on this issue today.

3. **Motio's improper Deposition Subpoenas to IBM, ENVISN, and Software Forces.** Motio's attempts to depose IBM, ENVISN, and Software Forces, whether oral or by written questions, are a violation of Judge Lefkow's order adopting the parties Joint 26(f) report limiting each party to 10 depositions. Furthermore, Motio's attempt to notice a deposition on written questions to ENVISN and Software Forces is a violation of Federal Rule 31, which requires leave of Court when more than 10 depositions are at issue. BSP expects that, since these notices are in violation of Court Order and the Federal Rules, Motio will immediately withdraw them and inform the recipients of their withdrawal. Please advise if you are available for a meet and confer on this issue today.

4. **Motio's Improper Document Subpoenas to Mr. David Kleinhans, ENVISN and Team Tech Systems, and Software Forces.** It is our understanding that Motio has subpoenaed these entities without providing a copy of these subpoenas to BSP prior to service, in violation of Federal Rule 45(b)(1). BSP requests the Motio immediately withdraw these subpoenas and notify the recipients of their withdrawal.

---

**From:** Drake, Jeffrey M. [mailto:drakej@millercanfield.com]
**Sent:** Monday, June 03, 2013 5:13 PM
**To:** Kaspar, Scott R.
**Cc:** BOST - File - BSP - Motio - 12 - 02100; 'Kelly J. Kubasta'; Todd Basile; Williams, Ryan C.
**Subject:** BSP v. Motio: June 5 Status Hearing

Scott-

Motio intends to raise the following issues with the Court during the scheduled status conference on Wednesday:

1. BSP's withholding of the following types of documents based upon purported privilege: (a) so-called board of advisors emails, (b) documents where Gerald.D@GMail.com is a listed recipient/sender, and (c) all entries that are purely internal to BSP where BSP's log fails to indicate that an attorney or accountant are involved;
2. Production of BSP's IM chat logs as described in my email from earlier today;
3. BSP's refusal to make Mr. Rachmiel available for his Rule 30(b)(1) deposition prior to his expected Rule 30(b)(6) testimony;
4. Motio will seek leave of court to take up to 14 depositions, five of which Motio intends to take pursuant to Rule 31. These additional depositions are required based upon BSP's Responses to Motio's Invalidity Contentions in which BSP contends that certain reference relied upon by Motio are not prior art. Please let me know if BSP intends to object to Motio's request and its basis for doing so.

Jeffrey

---

**Jeffrey M. Drake** | Attorney and Counselor at Law

**Miller Canfield**
225 W. Washington, Suite 2600
Chicago, Illinois 60606 (USA)
**T** +1.312.460.4234 | **F** +1.312.460.4201
drakej@millercanfield.com | View Profile + VCard

This electronic message and all of its contents and attachments contain information from the law firm of Miller, Canfield, Paddock and Stone, P.L.C. which may be privileged, confidential or otherwise protected from disclosure. The information is intended to be for the addressee only. If you are not the addressee, then any disclosure, copying, distribution or use of this message, or its contents or any of its attachments, is prohibited. If you have received this electronic message in error, please notify us immediately and destroy the original message and all copies.

_____

NOTICE TO PERSONS SUBJECT TO UNITED STATES TAXATION (MCPS)

DISCLOSURE UNDER TREASURY CIRCULAR 230: The United States Federal tax advice, if any, contained in this document and its attachments may not be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be used, by a taxpayer for the purpose of avoiding Federal tax penalties.

_____

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

# EXHIBIT

# D

## Drake, Jeffrey M.

| | |
|---|---|
| **From:** | RRodrigues@foley.com |
| **Sent:** | Monday, June 10, 2013 17:16 |
| **To:** | Kelly Kubasta |
| **Cc:** | BOST-File-BSP-Motio-12-02100@foley.com; 'Blair Reynolds'; Todd Basile; Drake, Jeffrey M. |
| **Subject:** | BSP v. Motio - IM Chat Logs |

Hi Kelly,

While it is Generally BSP's practice to not maintain logs for IM Chats, our vendor has identified a number of IM Chat logs.  Please confirm whether Motio agrees to also produce IM chat logs by tomorrow in order to provide time for processing of these IM Chat Logs for production.  If Motio agrees to similarly produce IM chat logs, we should be able to produce on June 14th, 2013 pursuant to Judge Schenkier's order.

Regards,

-Ruben

**Ruben J. Rodrigues**
Foley & Lardner LLP
321 North Clark Street, Suite 2800
Chicago, Illinois 60654

rrodrigues@foley.com
312-832-4568 (office)
617-763-5089 (mobile)

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party.

Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

# EXHIBIT

# E

### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| BSP SOFTWARE LLC, | |
| Plaintiff, | |
| vs. | Case No. 1:12-cv-2100 |
| MOTIO, INC., | |
| Defendant | |

### PLAINTIFF BSP SOFTWARE LLC'S INITIAL DICLOSURES

Pursuant to Fed. R. Civ. P. 26(a), and Local Patent Rule 2.1, Plaintiff BSP Software, LLC ("BSP"), by and through counsel, provides the following disclosures to Defendant, Motio, Inc. ("Motio").

These disclosures are made without waiver of, and without prejudice to, any objections BSP may have regarding discoverability, admissibility, relevance, or applicability of any privilege or immunity regarding the subject matter of these disclosures or any documents or individuals identified herein.

These disclosures are based on information reasonably available to BSP at this time. If and when BSP obtains additional, relevant information, it will further amend and/or supplement these disclosures to the extent required by Rule 26(e) of the Federal Rules of Civil Procedure.

**A.  The name, and if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

Based on information presently available to BSP, BSP believes that the individuals identified below are likely to have knowledge relevant to BSP's claims.  BSP reserve the right to supplement this list based on information learned during the course of discovery and continuing investigation.  BSP does not waive its right to object to the deposition of any of these individuals where proper:

| Name | May Have Information Relevant to: | Contact Information |
| --- | --- | --- |
| Andrew G. Rachmiel | Conception, development, design, operation, features works, and reduction to practice of the inventions claimed in U.S. Patent Nos. 7,945,589 (the '589 Patent) and 8,073,863 (the '863 Patent)<br><br>Prosecution of the applications that issued as the patents.<br><br>BSP Software's business operations.<br><br>The design, workings, features, operations, engineering, research and development, manufacturing, and production of products incorporating the technologies of the patents.<br><br>Sales of BSP's products.<br><br>Communications and interactions with Motio. | May be contacted through BSP's Counsel of record. |
| Andrew D. Weiss | Conception, development, design, operation, features works, and reduction to practice of the inventions claimed in U.S. Patent No. 7,945,589 (the '589 Patent).<br><br>Prosecution of the applications that issued as the patent. | May be contacted through BSP's Counsel of record. |

| Neil P. Morgan | Conception, development, design, operation, features works, and reduction to practice of the inventions claimed in U.S. Patent No. 8,073,863 (the '863 Patent)<br><br>Prosecution of the applications that issued as the patent.<br><br>BSP Software's business operations. | May be contacted through BSP's Counsel of record. |
| --- | --- | --- |
| Dariusz Danielewski | Conception, development, design, operation, features works, and reduction to practice of the inventions claimed in U.S. Patent No. 8,073,863 (the '863 Patent)<br><br>Prosecution of the applications that issued as the patent. | May be contacted through BSP's Counsel of record. |
| Lynn Moore | Design, development, functionality, use and sale of Motio's accused products.<br><br>Notice of BSP's patents. | May be contacted through Motio's Counsel of record. |
| Lance Hankins | Design, development, functionality, use and sale of Motio's accused products.<br><br>Notice of BSP's patents. | May be contacted through Motio's Counsel of record. |

There are likely additional individuals who will be identified in documents to be produced by the parties and in response to interrogatories who will have information related to the claims at issue. BSP reserves the right to supplement these disclosures. BSP additionally identifies, and incorporates herein by reference, any additional individuals disclosed by Motio in its initial disclosures.

**B.      A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

The following categories of documents, electronically stored information, and tangible things may be in the possession, custody, or control of BSP, Motio, and/or third parties. BSP is in the process of collecting, searching for, and identifying information relevant to its claims and reserves the right to supplement these disclosures.

- The Patents in suit.
- The File Histories of the Patents in suit.
- Documents relating to Motio's accused products.
- Documents related to the conception, reduction to practice, and prosecution of the patents-in-suit
- Documents related to the sales of Motio's accused products.

**C.      A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.**

BSP intends to seek all relief and recover all remedies available under the applicable laws, and reserves its right to seek a reasonable royalty and lost profits, the details of which will be the subject of expert discovery.   BSP reserves its right for a claim for its

attorneys' fees and other damages arising. BSP is unable to further estimate or compute its damages at this time.

      **D.**     **For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

      BSP is not aware of any insurance agreement under which an insurance business may be liable to satisfy all or a part of a possible judgment in this action.

      **E.**     **Document production pursuant to LPR 2.1(a)(1)**

      BSP is currently gathering and identifying documents that may be responsive to LPR 2.1(a)(1) and will produce responsive documents, if they exist.

      **F.**     **Document production pursuant to LPR 2.1(a)(2)**

      BSP is currently gathering and identifying documents that may be responsive to LPR 2.1(a)(1) and will produce responsive documents, if they exist.

      **G.**     **Document production pursuant to LPR 2.1(a)(3)**

      BSP is producing File Histories for the patents-in-suit, Bates Numbered BSP0000001-BSP0001009.

      **H.**     **Document production pursuant to LPR 2.1(a)(4)**

      BSP is producing File Histories for the patents-in-suit, Bates Numbered BSP000001-BSP001009.

Dated: April 24, 2012

Respectfully submitted,

**FOLEY & LARDNER LLP**

_____*John D. Lanza*_____

Ruben J. Rodrigues  (rrodrigues@foley.com)
321 N. Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: (312) 832-4500
Facsimile: (312) 832-4700

Matthew B. Lowrie (mlowrie@foley.com)
John D. Lanza (jlanza@foley.com)
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2600
Boston, MA 02199-7610
Telephone: (617) 342-4000
Facsimile: (617) 342-4001

*Attorneys for Plaintiff BSP Software, LLC*

## CERTIFICATE OF SERVICE

I certify that I caused to be served copies of the foregoing document on April 24, 2012, upon the following by e-mail:

Kelly J. Kubasta
James E. Davis
Todd Basile
KLEMCHUK KUBASTA LLP
8150 North Central Expwy., 10th Floor
Dallas, Texas 75206
Telephone: (214) 367-6000
Facsimile: (214) 367-6001
kelly.kubasta@kk-llp.com
jim.davis@kk-llp.com
todd.basile@kk-llp.com
docketing_kkllp@me.com

Jeffrey M. Drake
WOOD PHILLIPS
500 West Madison Street
Suite 3800
Chicago, IL 60661-2562
Ph: (312) 876-1800
jmdrake@woodphillips.com

Dated: April 24, 2012

By: /s/ *Ruben J. Rodrigues*
_____

Ruben J. Rodrigues

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BSP SOFTWARE LLC, | |
| Plaintiff, | |
| vs. | Case No. 1:12-cv-2100 |
| MOTIO, INC., | |
| Defendant | |

**PLAINTIFF BSP SOFTWARE LLC'S [FIRST SUPPLEMENTAL] INITIAL
DISCLOSURES**

Pursuant to Fed. R. Civ. P. 26(a), and Local Patent Rule 2.1, Plaintiff BSP Software, LLC ("BSP"), by and through counsel, provides the following disclosures to Defendant, Motio, Inc. ("Motio").

These disclosures are made without waiver of, and without prejudice to, any objections BSP may have regarding discoverability, admissibility, relevance, or applicability of any privilege or immunity regarding the subject matter of these disclosures or any documents or individuals identified herein.

These disclosures are based on information reasonably available to BSP at this time. If and when BSP obtains additional, relevant information, it will further amend and/or supplement these disclosures to the extent required by Rule 26(e) of the Federal Rules of Civil Procedure.

**A.**      **The name, and if known, the address and telephone number of each individual likely to have discoverable information—along with the subjects of that information—that the disclosing party may use to support its claims or defenses, unless the use would be solely for impeachment.**

Based on information presently available to BSP, BSP believes that the individuals identified below are likely to have knowledge relevant to BSP's claims.  BSP reserve the right to supplement this list based on information learned during the course of discovery and continuing investigation.  BSP does not waive its right to object to the deposition of any of these individuals where proper:

| Name | May Have Information Relevant to: | Contact Information |
|---|---|---|
| Andrew G. Rachmiel | Conception, development, design, operation, features works, and reduction to practice of the inventions claimed in U.S. Patent Nos. 7,945,589 (the '589 Patent) and 8,073,863 (the '863 Patent)<br><br>Prosecution of the applications that issued as the patents.<br><br>BSP Software's business operations.<br><br>The design, workings, features, operations, engineering, research and development, manufacturing, and production of products incorporating the technologies of the patents.<br><br>Sales of BSP's products and damages incurred by BSP.<br><br>Communications and interactions with Motio. | May be contacted through BSP's Counsel of record. |
| Andrew D. Weiss | Conception, development, design, operation, features works, and reduction to practice of the inventions claimed in U.S. Patent No. 7,945,589 (the '589 Patent).<br><br>Design and development of BSP's products. | May be contacted through BSP's Counsel of record. |

| | Prosecution of the applications that issued as the patent. | |
|---|---|---|
| Neil P. Morgan | Conception, development, design, operation, features works, and reduction to practice of the inventions claimed in U.S. Patent No. 8,073,863 (the '863 Patent)<br><br>Prosecution of the applications that issued as the patent.<br><br>BSP Software's business operations. | May be contacted through BSP's Counsel of record. |
| Dariusz Danielewski | Conception, development, design, operation, features works, and reduction to practice of the inventions claimed in U.S. Patent No. 8,073,863 (the '863 Patent)<br><br>Prosecution of the applications that issued as the patent. | May be contacted through his counsel. |
| Lynn Moore | Design, development, functionality, use and sale of Motio's accused products.<br><br>Notice of and willful infringement of BSP's patents.<br><br>Damages incurred by BSP. | May be contacted through Motio's Counsel of record. |
| Lance Hankins | Design, development, functionality, use and sale of Motio's accused products.<br><br>Notice of and willful infringement of BSP's patents.<br><br>Damages incurred by BSP. | May be contacted through Motio's Counsel of record. |
| Roger Moore | Design, development, functionality, use and sale of Motio's accused products.<br><br>Notice of and willful infringement of BSP's patents.<br><br>Damages incurred by BSP. | May be contacted through Motio's Counsel of record. |
| Matt Thibeau | Design, development, functionality, use and sale of Motio's accused products. | May be contacted through Motio's Counsel |

3

| | | of record. |
|---|---|---|
| | Notice of and willful infringement of BSP's patents.<br><br>Damages incurred by BSP. | |
| Charles Peterson | Sales of BSP's products and damages incurred by BSP.<br><br>Communications and interactions with Motio. | 2026 Upland Dr. Franklin, TN 37067 |
| Dustin Adkison | Sales of BSP's products and damages incurred by BSP.<br><br>Communications and interactions with Motio. | May be contacted through BSP's Counsel of record. |
| Charles Bowen | Sales of Motio's products and damages incurred by BSP.<br><br>Communications and interactions with BSP. | May be contacted through Motio's Counsel of record. |
| Health Alliance Plan of Michigan | Sales and Use of Motio's Products. | 2850 W. Grand Blvd. Detroit, MI 48202 |
| Concurrent Technologies Corporation (CTC) | Sales and Use of Motio's Products. | 100 CTC Drive Johnstown PA 15904 |
| Darren Nelson | Cognos/IBM Products<br><br>SpotOn Products | DGENelson@yahoo.com |
| IBM | Cognos/IBM Products | Maybe contacted through Counsel Russel DeClerk |

There are likely additional individuals identified in documents produced by the parties and in response to interrogatories who have information related to the claims at issue and who may also be called as witnesses. BSP reserves the right to supplement these disclosures. BSP additionally identifies, and incorporates herein by reference, any additional individuals disclosed by Motio in its initial disclosures and any supplementation thereto. BSP reserves the right to present any witness for any topic relevant to this case, the recited areas of information are exemplary only.

4

**B.     A copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment.**

The following categories of documents, electronically stored information, and tangible things may be in the possession, custody, or control of BSP, Motio, and/or third parties. BSP is in the process of collecting, searching for, and identifying information relevant to its claims and reserves the right to supplement these disclosures.

- The Patents in suit.

- The File Histories of the Patents in suit.

- Documents relating to Motio's accused products.

- Documents related to the conception, reduction to practice, and prosecution of the patents-in-suit

- Documents related to the sales of Motio's accused products.

- Documents produced in this litigation.

**C.     A computation of each category of damages claimed by the disclosing party—who must also make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered.**

BSP intends to seek all relief and recover all remedies available under the applicable laws, and reserves its right to seek a reasonable royalty and lost profits, the details of

5

which will be the subject of expert discovery. BSP reserves its right for a claim for its attorneys' fees and other damages arising. BSP is unable to further estimate or compute its damages at this time.

**D.      For inspection and copying as under Rule 34, any insurance agreement under which an insurance business may be liable to satisfy all or part of a possible judgment in the action or to indemnify or reimburse for payments made to satisfy the judgment.**

BSP is not aware of any insurance agreement under which an insurance business may be liable to satisfy all or a part of a possible judgment in this action.

**E.      Document production pursuant to LPR 2.1(a)(1)**

BSP has produced documents responsive to LPR 2.1(a)(1) to the extent they exist.

**F.      Document production pursuant to LPR 2.1(a)(2)**

BSP has produced documents responsive to LPR 2.1(a)(1) to the extent they exist.

**G.      Document production pursuant to LPR 2.1(a)(3)**

BSP has produced File Histories for the patents-in-suit, Bates Numbered BSP0000001-BSP0001009.

**H.      Document production pursuant to LPR 2.1(a)(4)**

BSP has producing File Histories for the patents-in-suit, Bates Numbered BSP0000001-BSP0001009.

Respectfully submitted,

Dated: June 28, 2013

   /s/   *Ruben J. Rodrigues*        

Scott R. Kaspar (ARDC 6284921)
Ruben J. Rodrigues  (ARDC 6300696)
FOLEY & LARDNER LLP
321 N. Clark Street, Suite 2800
Chicago, IL 60654-5313
Telephone: (312) 832-4500
Facsimile: (312) 832-4700
skaspar@foley.com
rrodrigues@foley.com

Matthew B. Lowrie (*pro hac vice*)
John D. Lanza (*pro hac vice*)
FOLEY & LARDNER LLP
111 Huntington Avenue, Suite 2600
Boston, MA 02199-7610
Telephone: (617) 342-4000
Facsimile: (617) 342-4001
mlowrie@foley.com
jlanza@foley.com

*Attorneys for Plaintiff BSP Software, LLC*

7

**<u>CERTIFICATE OF SERVICE</u>**

I, Ruben J. Rodrigues, an attorney, hereby certify that on June 28, 2013, I e-mailed the foregoing PLAINTIFF BSP SOFTWARE LLC'S [FIRST SUPPLEMENTAL] INITIAL DISCLOSURES, to counsel of record and constitutes service under Federal Rule of Civil Procedure 5(b)(2)(D) pursuant to Local Rule 5.9 of the Northern District of Illinois.

<div align="right">

/s/        *Ruben J. Rodrigues*
Ruben J. Rodrigues

</div>

# EXHIBIT

# F

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BSP SOFTWARE LLC, | Case No. 1:12-cv-2100 |
| Plaintiff, | Honorable Judge Joan H. Lefkow |
| vs. | Magistrate Judge Sidney I. Schenkier |
| MOTIO, INC., | |
| Defendant | |

## PLAINTIFF BSP SOFTWARE LLC'S RESPONSES TO DEFENDANT MOTIO, INC'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure and the applicable Local Rules and Patent Rules, Plaintiff BSP Software LLC ("BSP") hereby objects and respond to Defendant Motio Inc.'s ("Motio") First Set of Interrogatories (Nos. 1-13).

### GENERAL OBJECTIONS

1.      BSP objects to all interrogatories that call for information protected from discovery by the attorney-client privilege, work product immunity, and/or any other applicable privilege or protection.

2.      BSP objects to these interrogatories as overly broad, unnecessarily burdensome, and calling for information that is neither relevant nor reasonably calculated to lead to discovery of admissible evidence.

3.      BSP objects to these interrogatories to the extent that they purport to impose any duty beyond that specified in the Federal Rules of Civil Procedure or the Local Rules and Patent Rules of the United States District Court for the Northern District of Illinois.

4.      BSP objects to these interrogatories as unnecessarily burdensome to the extent that they seek information already in Motio's possession.

5.      BSP objects to these interrogatories as unnecessarily burdensome to the extent that they seek information not readily in the possession, custody or control of BSP.

6.      BSP objects to these interrogatories to the extent they call for third-party information or information protected from disclosure under any confidentiality obligation imposed by contract, by order or by understanding binding upon BSP.

7.      BSP objects to these interrogatories to the extent they call for information that BSP requires a reasonable opportunity to discover and analyze before responding. BSP reserves the right to supplement its responses to these interrogatories should further discovery reveal additional or different information.

8.      BSP objects to these interrogatories as vague and ambiguous.

9.      BSP objects to these interrogatories to the extent they are premature.

10.     BSP's responses to these interrogatories are subject to and without waiver of any objections, including claims of privilege and/or work product.

11.     BSP specifies that its objections and responses are based on Carbonite's understanding of Motio's interrogatories, the knowledge, information and belief it has acquired to the present date, the present state of BSP's preparation in connection with this action and the results to date of BSP's reasonable search for responsive information, which is ongoing.  These objections and responses and any subsequent objections and responses by BSP are, therefore, subject to amendment.  Under the applicable rules of the Federal Rules of Civil Procedure, the Local Rules and the Patent Rules, BSP reserves the right to supplement and amend these

responses, assert additional objections and supplement any subsequent responses as it proceeds to litigate this action.

12.     BSP objects to the definition of "Plaintiff," "You," or "Your" as overly broad and unduly burdensome to the extent that it requests information not readily in the possession, custody or control of BSP.

13.     BSP objects to the definition of "Related Patent" to the extent that it seeks information beyond the scope of discovery and not at issue in this litigation.

14.     BSP objects to the definition of "Plaintiff Product" as vague, overly broad, and unduly burdensome to the extent that it call for information from "at any time" and references "other products that serve the same purpose as, or are otherwise competitive with, any Accused Product."

15.     BSP objects to the instruction to "identify" as overly broad and unduly burdensome.  BSP also objects to this instruction to the extent it seeks information more easily or equally available to Motio as to BSP.

16.     BSP objects to the instructions numbered 3 and 4 as vague, overly broad, and unduly burdensome, and to the extent they are not consistent with the requirements of the Federal Rules of Civil Procedure, the Local Rules and Patent Rules.

## SPECIFIC OBJECTIONS AND RESPONSES

BSP incorporates by reference all the General Objections set forth above into each Specific Objection and Response set forth below.  Failure to repeat any General Objection shall not be construed as a waiver of said objection.

3

**INTERROGATORY NO. 1:**

Describe in complete detail the factual and legal basis and supporting evidence for what Plaintiff contends to be the date of invention (i.e., conception, actual and constructive reduction to practice, and any diligence leading to reduction to practice) for each claim of any Asserted Patent.

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to BSP's General Objections, BSP also objects to this interrogatory to the extent that it seeks information subject to Attorney Client Privilege or Work Product doctrine.

Subject to, and without waiving BSP's General and Specific Objections, and to the extent that BSP understands this interrogatory, BSP responds as follows:



**INTERROGATORY NO. 2:**

Describe in complete detail all design and development activities, by or on behalf of Plaintiff, relating to the subject matter of any claim of any Asserted Patent or any Related Patent, including the Persons involved, their respective contributions to the design and development, and any compensation provided for such contributions.

**RESPONSE TO INTERROGATORY NO. 2:**

In addition to BSP's General Objection, BSP also objects to this interrogatory as overly broad and unduly burdensome to the extent that it requests "all design and development

4

activities."  BSP further objects to this interrogatory to the extent the terms "relating to the subject matter of any claim", "involved", and "respective contributions" are vague and ambiguous.

Subject to, and without waiving BSP's General and Specific Objections, and to the extent that BSP understands this interrogatory, BSP responds as follows:

The inventors of U.S. Patent No. 7,945,589 ("the '589 patent") are Andrew D. Weiss and Andrew G. Rachmiel.  The inventors of U.S. Patent No. 8,073,863 ("the '863 patent") are Andrew G. Rachmiel, Neil P. Morgan, and Dariusz Danielewski.  All inventors conceived and reduced to practice the inventions of the '589 and '863 patents while at BSP.

**INTERROGATORY NO. 3:**

Identify each product (including prototypes) made, used, sold, or imported by Plaintiff or its licensees that embodies, that was made by, or that is used when practicing, the subject matter of any claim of any Asserted or Related Patent.

**RESPONSE TO INTERROGATORY NO. 3:**

In addition to BSP's General Objections, BSP objects to this interrogatory to the extent the terms "including prototypes" and "subject matter of any claim" are vague and ambiguous.

Subject to, and without waiving BSP's General and Specific Objections, and to the extent that BSP understands this interrogatory, BSP responds as follows:

BSP's MetaManager product embodies and practices the asserted claims of the '863 Patent.  BSP's Integrated Control Suite products embody and practice the asserted claims of the '589 Patent.

# EXHIBIT

# G

**Drake, Jeffrey M.**

| | |
|---|---|
| **From:** | SKaspar@foley.com |
| **Sent:** | Thursday, September 19, 2013 12:38 |
| **To:** | 'Kelly J. Kubasta' |
| **Cc:** | 'Elizabeth Blair Reynolds'; Drake, Jeffrey M.; 'Todd Basile'; BOST-File-Avnet-Motio-12-02100@foley.com |
| **Subject:** | Avnet & BSP v. Motio |
| **Attachments:** | Motio_Native.tc; 9-10-13 Kubasta email.pdf |

From the Desk of: Scott R. Kaspar



Kelly,

Attached is a TrueCrypt container that includes the native versions of the three documents raised in your September 10, 2013 email (copy attached).

In a separate email I will forward to you the password for this TrueCrypt container.

Let me know if you have any questions.

Best,
Scott



My Bio | Download V-card | Location

Scott R. Kaspar

Foley & Lardner LLP
Attorneys at Law
321 N. Clark
Suite 2800
Chicago, IL 60654-5313

Tel 312-832-5113
Fax 312-832-4700

Email skaspar@foley.com
Web www.foley.com



The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be

1

# EXHIBIT

# H

**Drake, Jeffrey M.**

| | |
|---|---|
| **From:** | SKaspar@foley.com |
| **Sent:** | Wednesday, June 26, 2013 09:00 |
| **To:** | Drake, Jeffrey M. |
| **Cc:** | 'Kelly J. Kubasta'; BOST-File-BSP-Motio-12-02100@foley.com; 'Elizabeth Blair Reynolds'; 'Todd Basile'; 'Jim Davis'; 'Austin Champion'; Williams, Ryan C. |
| **Subject:** | RE: BSP v. Motio |

From the Desk of: Scott R. Kaspar



My Location     My V-card     My Bio     www.foley.com

Jeffrey,

I confirmed with Mr. Rachmiel that he does not have access to any of the accounts Kelly mentions below. As I mentioned in our discussion several weeks ago, the Comcast account has not been accessed since 2009, and I have confirmed that the WOW account has not been accessed since early 2011. Mr. Rachmiel does not have login credentials for any of the accounts.

I am happy to discuss further if you wish, and I am available following Mr. Weiss's deposition tomorrow morning.

Regards,
Scott

**From:** Drake, Jeffrey M. [mailto:drakej@millercanfield.com]
**Sent:** Wednesday, June 26, 2013 7:15 AM
**To:** Kaspar, Scott R.
**Cc:** Kelly J. Kubasta; BOST - File - BSP - Motio - 12 - 02100; Elizabeth Blair Reynolds; Todd Basile; Jim Davis; Austin Champion; Williams, Ryan C.
**Subject:** Re: BSP v. Motio

Scott-

We disagree that these accounts are outside of the possession, custody, or control of BSP. Moreover, BSP's refusal to explain its position is unfortunate given the deposition testimony of Mr. Rachmiel.

Please let me know when you are able to meet and confer on this issue.

Jeffrey

On Jun 26, 2013, at 0:45, "SKaspar@foley.com" <SKaspar@foley.com> wrote:

Kelly,

I reiterate BSP's position that anything in BSP's possession, custody, or control was investigated, and has been produced in accordance with the parties' agreement on ESI discovery.

These alias accounts that you reference have not been active for several years. They are outside of the possession, custody, and control of BSP. Accordingly, BSP has been and remains in compliance with its Rule 26 discovery obligations.

---

**From:** Kelly J. Kubasta [mailto:kelly.kubasta@kk-llp.com]
**Sent:** Monday, June 24, 2013 1:04 PM
**To:** Kaspar, Scott R.
**Cc:** BOST - File - BSP - Motio - 12 - 02100; 'Elizabeth "Blair" Reynolds'; 'Todd Basile'; 'Jim Davis'; 'Austin Champion'; 'Jeffrey Drake'
**Subject:** Re: BSP v. Motio

Scott,

During the 30(b)(6) deposition on Friday, Mr. Rachmiel provided testimony regarding multiple "John Porter" alias email addresses he used during his employment at BSP. This includes Exhibit No. 47 which was an email to Andrew Weiss providing the password for accessing such email accounts (see pages 314-316 of rough draft transcript). Among other things, Mr. Rachmiel testified that he had not changed the password since that time and that it's possible that Mr. Weiss has accessed the accounts since January 18, 2011.

Moreover, BSP's stated understanding that the email account associated with cory.bradford@comcast.net was abandoned in early 2009 is contradicted by Exhibit No. 18 from the 30(b)(6) deposition, as well as Mr. Rachmiel's testimony that he "would imagine" that the email account did not become inactive until after May 19, 2010.

Please confirm that BSP will take immediate steps to preserve and produce any and all emails relating to any of the John Porter, Cory Bradford, or any other as-yet-unidentified alias email accounts of the BSP custodians, including but not limited to investigating whether the password of Exhibit No. 47 allows access to the John Porter email accounts.

Regards,
Kelly

**Kelly J. Kubasta**
**Partner**
**KLEMCHUK KUBASTA LLP**
Campbell Centre II
8150 North Central Expressway, 10th Floor
Dallas, TX 75206

214.367.6000 (t) • kelly.kubasta@kk-llp.com

214.764.5614 (f) • www.kk-llp.com

Twitter: @kkubasta

2

Click here to get our KK-LLP iPhone App!



This email message and any attachments are for the sole use of the intended recipient(s) and contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message and any attachments.

On Jun 23, 2013, at 11:42 AM, skaspar@foley.com wrote:

Kelly,

I urge you to discuss this with your local counsel, Mr. Drake, as we had a lengthy discussion about this following your June 10th email.

In any event, at the time that BSP collected ESI for the agreed-upon custodians, our ESI vendor imaged those email inboxes that were in the possession, custody, or control of BSP at that time, consistent with the Federal Rules of Civil Procedure and well-established case law.

I can confirm that the email account associated with cory.bradford@comcast.net was not searched, because that account was not in BSP's possession, custody, or control at that time, or at any time since. I have not received a transcript to the 14 hours of deposition questioning that you took this week of Mr. Rachmiel, but my understanding is that the email account associated with cory.bradford@comcast.net was abandoned in early 2009. Indeed, based on my investigation following your June 10th email, the account is not active.

I do not know at this about the various John Porter email addresses you mention below, but I will investigate and let you know. My suspicion is that, to the extent that Mr. Rachmiel ever had access to the account(s) associated with these John Porter email addresses, the account was similarly abandoned long before this litigation.

Regards,
Scott

---

**From:** Kelly J. Kubasta [mailto:kelly.kubasta@kk-llp.com]
**Sent:** Sunday, June 23, 2013 11:14 AM
**To:** Kaspar, Scott R.
**Cc:** BOST - File - BSP - Motio - 12 - 02100; Elizabeth "Blair" Reynolds; Todd Basile; Jim Davis; Austin

Champion; Jeffrey Drake
**Subject:** BSP v. Motio

Scott,

During the BSP 30(b)(6) deposition on Friday, June 21, 2013, Mr. Rachmiel testified that he (and/or others at BSP) used at least the alias email addresses: (a) Cory.Bradford@comcast.net; (b) john.porter@wowway.com; and (c) j.porter@wowway.com.  Please confirm that all records associated with these email addresses have been fully searched and produced as agreed by the parties.

Moreover, as originally requested in an email to you on June 10, 2013, please identify any other alias email addresses utilized by any of the BSP custodians and search/produce all records associated therewith.

Regards,
Kelly

**Kelly J. Kubasta**
**Partner**
**KLEMCHUK KUBASTA LLP**
Campbell Centre II
8150 North Central Expressway, 10th Floor
Dallas, TX 75206

214.367.6000 (t) • kelly.kubasta@kk-llp.com

214.764.5614 (f) • www.kk-llp.com

Twitter: @kkubasta
Click here to get our KK-LLP iPhone App!



This email message and any attachments are for the sole use of the  intended recipient(s) and  contain confidential and/or privileged information. Any unauthorized review, use, disclosure or distribution is prohibited.  If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message and any attachments.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party. Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties,

and was not written to support the promotion or marketing of any transaction or matter discussed herein.

The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party. Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

_____

NOTICE TO PERSONS SUBJECT TO UNITED STATES TAXATION (MCPS)

DISCLOSURE UNDER TREASURY CIRCULAR 230: The United States Federal tax advice, if any, contained in this document and its attachments may not be used or referred to in the promoting, marketing or recommending of any entity, investment plan or arrangement, nor is such advice intended or written to be used, and may not be used, by a taxpayer for the purpose of avoiding Federal tax penalties.

_____

INFO The preceding email message may be confidential or protected by the attorney-client privilege. It is not intended for transmission to, or receipt by, any unauthorized persons. If you have received this message in error, please (i) do not read it, (ii) reply to the sender that you received the message in error, and (iii) erase or destroy the message. Legal advice contained in the preceding message is solely for the benefit of the Foley & Lardner LLP client(s) represented by the Firm in the particular matter that is the subject of this message, and may not be relied upon by any other party. Internal Revenue Service regulations require that certain types of written advice include a disclaimer. To the extent the preceding message contains advice relating to a Federal tax issue, unless expressly stated otherwise the advice is not intended or written to be used, and it cannot be used by the recipient or any other taxpayer, for the purpose of avoiding Federal tax penalties, and was not written to support the promotion or marketing of any transaction or matter discussed herein.

# Exhibit I

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| AVNET, INC. and BSP Software LLC, | |
| Plaintiffs/Counter-Defendants, | Civil Action No. 1:12-CV-02100 |
| v. | Hon. Judge Joan H. Lefkow |
| Motio, Inc., | Magistrate Judge Sidney I. Schenkier |
| Defendant/Counter-Plaintiff. | |

**MOTIO, INC.'S AMENDED ANSWER, AFFIRMATIVE DEFENSES
AND COUNTERCLAIMS TO AVNET, INC. AND BSP SOFTWARE LLC'S
AMENDED COMPLAINT**

Defendant/Counter-Plaintiff Motio, Inc. ("Motio") files this Amended Answer, Affirmative Defenses and Counterclaims to Plaintiffs Avnet, Inc. ("Avnet") and BSP Software LLC's ("BSP") (collectively "Plaintiffs") Amended Complaint ("Amended Complaint"). Motio denies the allegations and characterizations in the Amended Complaint unless expressly admitted in the following paragraphs:

**COMPLAINT**

1.      Plaintiff, Avnet, Inc. ("Avnet"), is a New York corporation with its principal place of business at 2211 South 47th Street, Phoenix, Arizona 85034.

**ANSWER**:  Motio lacks knowledge sufficient to confirm or deny the allegations of Paragraph 1 and therefore denies the same.

2.      Plaintiff, BSP Software LLC ("BSP"), is an Illinois limited liability company with its principal place of business at 1701 West Golf Road, Suite 3-604, Rolling Meadows, Illinois 60008. Avnet acquired BSP in October 2012 via an equity purchase. As a result of the purchase, Avnet has obtained all rights, title, and interest in and to BSP's intellectual property, including the patents-in-suit.

**ANSWER**:  Motio lacks knowledge sufficient to confirm or deny the allegations of Paragraph 2 and therefore denies the same.

3.     On information and belief, Defendant Motio, Inc. ("Motio"), is a Texas corporation with its principal place of business at 18333 Preston Road, Suite 475, Dallas, Texas 75252.

**ANSWER:**     Motio admits it is a Texas corporation, with its principal place of business at 18333 Preston Road, Suite 475, Dallas, Texas 75252.

4.     This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

**ANSWER:**     Motio admits that this action is for patent infringement under the patent laws of the United States, Title 35 of the United States Code.  Motio further admits that this Court has subject matter jurisdiction.

5.     As alleged herein, Motio has infringed (literally and/or by equivalents), and is continuing to infringe, Avnet's patents by making, using, importing, selling, and/or offering to sell products covered by one or more patent claims of Avnet's patents – or by performing any method claimed therein – within the United States, and/or by contributing to or inducing such infringement.

**ANSWER:**     Motio denies the allegations of Paragraph 5.

6.     Among many other things, Avnet, through its wholly owned subsidiary BSP, develops and sells business intelligence software solutions, including products for enhancing and/or extending the Cognos software provided by International Business Machines Corporation ("IBM").

**ANSWER:**     Motio admits that BSP is in the business of making and selling software applications intended to complement the IBM Cognos software.  Motio lacks knowledge sufficient to confirm or deny the remaining allegations of Paragraph 6.  Except as expressly admitted herein, Motio denies each and every allegation of Paragraph 6.

7.     Motio is a software company which also develops and sells business intelligence software solutions, including products for enhancing and/or extending IBM's Cognos software such as Motio's MotioCI and MotioPI products.

**ANSWER:**     Motio admits that it is in the business of developing, making, and

2

selling software applications that extend, augment and streamline the IBM Cognos software. Motio further admits that its suite of products includes software applications referred to as MotioCI™ and MotioPI™.

8.      U.S. Patent No. 7,945,589 claims systems and methods for integrating change management in a business intelligence system.

**ANSWER:**   Motio admits that U.S. Patent No. 7,945,589 ("the '589 patent") is entitled "Integrated Change Management in a Business Intelligence Environment" and includes 20 claims. Except as expressly admitted herein, Motio denies each and every allegation of Paragraph 8.

9.      U.S. Patent No. 8,073,863 claims systems and methods for batch management of metadata in a business intelligence system.

**ANSWER:**   Motio admits that U.S. Patent No. 8,073,863 ("the '863 patent") is entitled "Batch Management of Metadata in a Business Intelligence Architecture" and includes 38 claims. Except as expressly admitted herein, Motio denies each and every allegation of Paragraph 9.

10.     Avnet, through its subsidiary BSP, informed Motio of its rights to U.S. Patent No. 7,945,589 patent at least as early as June 3, 2011 and of its right to U.S. Patent No. 8,073,863 at least as early as January 27, 2012.

**ANSWER:**   Motio admits that BSP first advised Motio of the '589 patent on June 3, 2011. Motio admits that BSP first advised Motio of the '863 patent on January 27, 2012. Except as expressly admitted herein, Motio denies each and every allegation of Paragraph 10.

## COUNT I
### (INFRINGEMENT OF U.S. PATENT NO. 7,945,589)

11.     Motio restates its answers to each of the previous paragraphs 1-10 and incorporates them herein.

12.     On May 17, 2011, United States Patent No. 7,945,589 ("the '589 patent") entitled "Integrated Change Management in a Business Intelligence Environment" was duly and legally

3

issued to BSP, with Andrew D. Weiss and Andrew G. Rachmiel as inventors. Avnet is the owner of all right, title, and interest in and to the '589 patent. A copy of the '589 patent is attached as Exhibit A.

> **ANSWER:** Motio admits that the face of the '589 patent indicates the patent
>
> issued on May 17, 2011, with Andrew D. Weiss and Andrew G. Rachmiel as named
>
> inventors, and is entitled "Integrated Change Management in a Business Intelligence
>
> Environment." Motio admits a purported copy is attached to the Complaint as Exhibit A,
>
> but lacks knowledge sufficient to confirm or deny it is a true and correct copy. Motio
>
> lacks knowledge sufficient to confirm or deny the remaining allegations of Paragraph 12
>
> and therefore denies the same. Except as expressly admitted herein, Motio denies each
>
> and every allegation of Paragraph 12.

13. On information and belief, Motio has infringed and is infringing one or more of the claims of the '589 patent, either literally and/or under the doctrine of equivalents, directly and/or indirectly.

> **ANSWER:** Motio denies the allegations of Paragraph 13.

14. On information and belief, Motio has infringed (literally and/or by equivalents), and is continuing to infringe, the '589 patent by providing, installing, making, using and/or selling Motio's MotioCI product within the United States, and/or by contributing to or inducing such infringement by others, by providing, installing, making, using and/or selling Motio's MotioCI product in the United States, with the intent to cause infringement of the '589 patent.

> **ANSWER:** Motio denies the allegations of Paragraph 14.

15. On information and belief, Defendant's infringement of the '589 patent is and has been willful, has caused and will continue to cause Avnet to suffer substantial damages, and has caused and will continue to cause Avnet to suffer irreparable harm for which there is no adequate remedy at law.

> **ANSWER:** Motio denies the allegations of Paragraph 15.

### COUNT II
### (INFRINGEMENT OF U.S. PATENT NO. 8,073,863)

16. Motio restates its answers to each of the previous paragraphs 1-15 and incorporates them herein.

17.     On December 6, 2011, United States Patent No. 8,073,863 ("the '863 patent") entitled "Batch Management of Metadata in a Business Intelligence Architecture" was duly and legally issued to BSP, with Andrew G. Rachmiel, Neil P. Morgan, and Dariusz Danielewski as inventors. Avnet is the owner of all right, title, and interest in and to the '863 patent. A copy of the '863 patent is attached as Exhibit B.

**ANSWER:**     Motio admits that the face of the '863 patent indicates the patent issued on December 6, 2011, with Andrew G. Rachmiel, Neil P. Morgan, and Dariusz Danielewski as named inventors, and is entitled "Batch Management of Metadata in a Business Intelligence Architecture."  Motio admits a purported copy is attached to the Complaint as Exhibit B, but lacks knowledge sufficient to confirm or deny it is a true and correct copy.  Motio lacks knowledge sufficient to confirm or deny the remaining allegations of Paragraph 17 and therefore denies the same.  Except as expressly admitted herein, Motio denies each and every allegation of Paragraph 17.

18.     On information and belief, Motio has infringed and is infringing one or more of the claims of the '863 patent, either literally and/or under the doctrine of equivalents, directly and/or indirectly.

**ANSWER:**     Motio denies the allegations of Paragraph 18.

19.     On information and belief, Motio has infringed (literally and/or by equivalents), and is continuing to infringe, the '863 patent by providing, installing, making, using and/or selling Motio's MotioPI and/or MotioPI Pro products within the United States, and/or by contributing to or inducing such infringement by others, by providing, installing, making, and/or selling Motio's MotioPI and MotioPI Pro products in the United States, with the intent to cause infringement of the '863 patent.

**ANSWER:**     Motio denies the allegations of Paragraph 19.

20.     On information and belief, Defendant's infringement of the '863 patent is and has been willful, has caused and will continue to cause Avnet to suffer substantial damages, and has caused and will continue to cause Avnet to suffer irreparable harm for which there is no adequate remedy at law.

**ANSWER:**     Motio denies the allegations of Paragraph 20.

**DEMAND FOR JURY TRIAL**

21.     Avnet hereby demands a jury trial on all issues so triable.

**ANSWER:**     No response is required for the demand for jury trial contained in Paragraph 21.  Any other factual allegation not specifically admitted is denied.

## PRAYER FOR RELIEF

WHEREFORE, Avnet respectfully requests that this Court enter judgment in its favor and grant the following relief:

A.     A judgment that Motio has directly infringed the asserted claims of '589 patent, contributorily infringed the '589 patent, and/or induced infringement of the '589 patent;

B.     A judgment that Motio has directly infringed the asserted claims of '863 patent, contributorily infringed the '863 patent, and/or induced infringement of the '863 patent;

C.     A permanent injunction enjoining Motio and its affiliates, subsidiaries, officers, directors, employees, agents, representatives, licensees, successors, assigns, and all those acting for any of them or on their behalf, or acting in concert with them, from further infringement of the '589 and '863 patents;

D.     A judgment that Motio's infringement has been willful;

E.     An award of attorneys' fees incurred in prosecuting this action, on the basis that this is an exceptional case;

F.     A judgment and order requiring Motio to pay Avnet damages under 35 U.S.C. §284, including supplemental damages for any continuing post-verdict infringement up until entry of the final judgment, with an accounting, as needed, and treble damages for willful infringement as provided by 35 U.S.C. § 284;

G.     A judgment and order requiring Motio to pay Avnet the costs of this action (including all disbursements);

H.     A judgment and order requiring Motio to pay Avnet pre-judgment and post-judgment interest on the damages awarded; and

I.     Further relief as the Court may deem just and proper.

**ANSWER:**     Motio respectfully requests that the Court: **(a)** deny all relief to Plaintiffs, including that requested by Plaintiffs in the Prayer for Relief; **(b)** enter judgment in favor of Motio; **(c)** award Motio attorneys' fees and costs incurred in

defending this action pursuant to 35 U.S.C. § 285; and **(d)** award Motio such further relief as the law and the facts may warrant, and the Court deems just and proper.

## MOTIO'S AFFIRMATIVE DEFENSES

### FIRST DEFENSE
### (FAILURE TO STATE A CLAIM)

22.     Plaintiffs failed to state a claim upon which relief can be granted.

### SECOND DEFENSE
### (NONINFRINGEMENT OF U.S. PATENT NOS. 7,945,589 AND 8,073,863)

23.     Motio does not infringe and has not infringed any claim of the '589 patent under any theory (including directly (whether individually or jointly) or indirectly (whether contributorily or by inducement)).

24.     Motio does not infringe and has not infringed any claim of the '863 patent under any theory (including directly (whether individually or jointly) or indirectly (whether contributorily or by inducement)).

### THIRD DEFENSE
### (INVALIDITY OF PATENT NOS. 7,945,589 AND 8,073,863)

25.     One or more claims of the '589 patent are invalid because the alleged inventions fail to satisfy the conditions for patentability specified in 35 U.S.C. § 100 *et seq.*, including §§ 101, 102, 103, and 112.

26.     One or more claims of the '863 patent are invalid because the alleged inventions fail to satisfy the conditions for patentability specified in 35 U.S.C. § 100 *et seq.*, including §§ 101, 102, 103, and 112.

### FOURTH DEFENSE
### (LIMITATION OF DAMAGES FOR FAILURE TO MARK)

27.     To the extent that Plaintiffs, any alleged predecessors in interest to the '589 patent and/or their respective licensees, failed to properly mark any of their relevant products as required by 35 U.S.C. § 287 or otherwise give proper notice that Motio's actions allegedly infringed any claim(s) of the '589 patent, Motio is not liable to Plaintiffs for the acts alleged to have been performed before it received actual notice that it was allegedly infringing any claim(s) of the '589 patent.

28.     To the extent that Plaintiffs, any alleged predecessors in interest to the '863 patent and/or their respective licensees, failed to properly mark any of their relevant products as required by 35 U.S.C. § 287 or otherwise give proper notice that Motio's actions allegedly infringed any claim(s) of the '863 patent, Motio is not liable to Plaintiffs for the acts alleged to

have been performed before it received actual notice that it was allegedly infringing any claim(s) of the '863 patent.

## FIFTH DEFENSE
### (LIMITATION OF DAMAGES FOR INDIRECT INFRINGEMENT)

29.    To the extent that Plaintiffs assert that Motio indirectly infringes any claim(s) of the '589 patent, either by contributory infringement or inducement of infringement, Motio is not liable to Plaintiffs for the acts alleged to have been performed before Motio knew that its actions would cause indirect infringement.

30.    To the extent that Plaintiffs assert that Motio indirectly infringes any claim(s) of the '863 patent, either by contributory infringement or inducement of infringement, Motio is not liable to Plaintiffs for the acts alleged to have been performed before Motio knew that its actions would cause indirect infringement.

## SIXTH DEFENSE
### (PRIOR COMMERCIAL USE)

31.    Plaintiffs' attempted enforcement of the '589 patent against Motio is barred by the prior commercial use defense of 35 U.S.C. § 273.

32.    Plaintiffs' attempted enforcement of the '863 patent against Motio is barred by the prior commercial use defense of 35 U.S.C. § 273.

## SEVENTH DEFENSE
### (LACK OF STANDING)

33.    Plaintiffs lacks standing to enforce the '589 patent against Motio.

34.    Upon information and belief, IBM is entitled to partial or sole ownership of the '589 patent.

35.    Upon information and belief, Andrew Weiss ("Weiss"), a named inventor of the '589 patent, made an inventive contribution to the claimed subject matter of the '589 patent while he was still employed with Cognos (which was later acquired by IBM).

36.    Under the terms of Weiss' employment agreement with Cognos, Weiss has a contractual or other obligation to assign ownership of the '589 patent to Cognos (now IBM).

37.    Any claim by Plaintiffs for infringement of the '589 patent is barred because neither BSP nor Avnet is the rightful or lawful owner or assignee of the '589 patent.

38.    Plaintiffs lack standing to enforce the '863 patent against Motio.

39.    Upon information and belief, IBM is entitled to partial or sole ownership of the '863 patent.

40.     Warren Baelen ("Baelen") and Weiss, while employed by IBM, performed contract services for BSP (now Avnet) through a company called Team Tech Systems, Inc. Baelen and Weiss developed much of the MetaManager product, the purported commercial reduction to practice of the '863 patent, and therefore, developed much of the claimed subject matter of the '863 patent.  Accordingly, one or both made inventive contributions to the claimed subject matter and should have been named as inventor(s) thereof.

41.     Moreover, Baelen and Weiss may have had a contractual or other obligation to assign ownership to IBM.

42.     Any claim by Plaintiffs for infringement of the '863 patent is barred because neither BSP nor Avnet is the rightful or lawful owner or assignee of the '863 patent.

### EIGHTH DEFENSE
#### (UNCLEAN HANDS)

43.     Plaintiffs' claims under the '589 patent are barred by the doctrine of unclean hands.

44.     Upon information and belief, IBM is entitled to partial or sole ownership of the '589 patent.

45.     Upon information and belief, Weiss, a named inventor of the '589 patent, made an inventive contribution to the claimed subject matter of the '589 patent while he was still employed with Cognos (which was later acquired by IBM).

46.     Under the terms of Weiss' employment agreement with Cognos, Weiss has a contractual or other obligation to assign ownership of the '589 patent to Cognos (now IBM).

47.     Avnet's claims under the '863 patent are barred by the doctrine of unclean hands.

48.     Upon information and belief, IBM is entitled to partial or sole ownership of the '863 patent.

49.     Baelen and Weiss, while employed by IBM, performed contract services for BSP (now Avnet) through a company called Team Tech Systems, Inc.  Baelen and Weiss developed much of the MetaManager product, the purported commercial reduction to practice of the '863 patent, and therefore, developed much of the claimed subject matter of the '863 patent. Accordingly, one or both made inventive contributions to the claimed subject matter and should have been named as inventor(s) thereof.

50.     Moreover, Baelen and Weiss may have had a contractual or other obligation to assign ownership to IBM.

## NINTH DEFENSE
### (UNENFORCEABILITY)

51.     For at least the reasons set forth in the Counterclaims below, the '589 patent is unenforceable due to the inequitable conduct of the applicants and their agents responsible for prosecution of the patent.

52.     For at least the reasons set forth in the Counterclaims below, the '863 patent is unenforceable due to the inequitable conduct of the applicants and their agents responsible for prosecution of the patent.

## COUNTERCLAIMS

## INTRODUCTION

1.     Counterclaim Plaintiff Motio, Inc. ("Motio") brings its counterclaims against BSP Software LLC's ("BSP") and Avnet, Inc. ("Avnet") based on their fraudulent conduct before the United States Patent and Trademark Office ("USPTO") during the prosecution of U.S. Patent No. 7,945,589 ("the '589 patent"), including:  **(a)** the intentional withholding and concealment of information material to patentability from the USPTO; **(b)** false and intentionally misleading statements made to the USPTO; and **(c)** the submission of doctored and fabricated chat logs to the USPTO.

2.     The actions described herein were committed for the express purpose of deceiving the USPTO in order to fraudulently obtain the '589 patent and to misuse the legal system through a sham lawsuit designed to illegally monopolize the relevant markets.

3.     By way of these counterclaims, Motio seeks: **(a)** a declaration of invalidity of the '589 patent; **(b)** a declaration of non-infringement for Motio's products found in the marketplace long before BSP fraudulently obtained the '589 patent; **(c)** a declaration of unenforceability of the '589 patent based on BSP's inequitable and fraudulent conduct; **(d)** damages for the competitive harm caused by BSP's sham lawsuit and illegal monopolization of the market; and **(e)** the attorneys' fees and costs incurred in defending against BSP's sham lawsuit.

4.      Motio further seeks: **(a)** a declaration of invalidity of U.S. Patent No. 8,073,863 ("the '863 patent"); **(b)** a declaration of non-infringement of the '863 patent for Motio's product; **(c)** a declaration of unenforceability of the '863 patent based on BSP's inequitable conduct; and **(d)** the attorneys' fees and costs incurred defending against BSP's wrongful assertion of the '863 patent.

<div align="center">**PARTIES**</div>

5.      Counterclaim Plaintiff Motio is a Texas corporation, with its principal place of business at 18333 Preston Road, Suite 475, Dallas, Texas 75252.

6.      On information and belief, BSP is an Illinois limited liability company, with its principal place of business at 1701 West Golf Road, Suite 3-604, Rolling Meadows, Cook County, Illinois 60008.

7.      BSP was formed in 2006 as a spin-out of BrightStar Partners, Inc. ("BrightStar Partners"), for the purpose of becoming the software development arm of BrightStar Partners. For convenience, the term "BSP" refers to BrightStar Partners, Inc. and/or BSP Software LLC.

8.      On information and belief, Avnet is a New York corporation with its principal place of business at 2211 South 47th Street, Phoenix, Arizona 85034.  Avnet, a Fortune 500 company, has annual sales in excess of $25 billion and over 17,500 employees.

9.      On information and belief, Avnet acquired BSP in October 2012, and BSP is currently a wholly-owned subsidiary of Avnet.

<div align="center">**THE PURPORTED INVENTORS OF THE PATENTS-IN-SUIT**</div>

10.      As represented by Andrew D. Weiss ("Weiss") in a sworn Declaration of Inventors under 37 C.F.R. § 1.131 submitted to the USPTO in connection with the prosecution of the '589 patent, Weiss was an employee or member of BSP until BSP became a wholly-owned

<div align="center">11</div>

subsidiary of Avnet. Prior to that, Weiss was employed by Cognos Corporation. Weiss is a named inventor of the '589 patent.

11.     As represented by Andrew G. Rachmiel ("Rachmiel") in a sworn Declaration of Inventors under 37 C.F.R. § 1.131 submitted to the USPTO in connection with the prosecution of the '589 patent, Rachmiel was an employee or member of BSP until BSP became a wholly-owned subsidiary of Avnet. Prior to that, Rachmiel was employed by Cognos Corporation. Rachmiel is a named inventor of both the '589 patent and the '863 patent.

12.     At all times herein material, Neil P. Morgan ("Morgan") was a co-founder and owner of BSP until BSP became a wholly-owned subsidiary of Avnet. Morgan is a named inventor of '863 patent.

13.     At all times herein material, Dariusz Danielewski ("Danielewski") was an employee or member of BSP until BSP became a wholly-owned subsidiary of Avnet. Danielewski is a named inventor of the '863 patent.

## JURISDICTION AND VENUE

14.     These counterclaims arise under the patent laws of the United States, Title 35, United States Code, and the antitrust laws, specifically 15 U.S.C. § 1 *et. seq.* The jurisdiction of this Court is proper under at least 35 U.S.C. § 271 *et seq.* and 28 U.S.C. §§ 1331, 1338, 1367, and 2201-02.

15.     Venue is proper in this District, and in the Eastern Division, pursuant to at least 28 U.S.C. §§ 1391 and 1400.

## FACTS GIVING RISE TO MOTIO'S COUNTERCLAIMS

### I.  FACTS REGARDING THE '589 PATENT

**A.  Accelerated Prosecution Of The '589 Patent**

16.  On July 22, 2010, named inventors Rachmiel and Weiss filed the application that ultimately matured into the '589 patent when it issued on May 17, 2011.

17.  The '589 patent purports to be a continuation of U.S. Patent Application No. 12/578,669, filed on October 14, 2009, which purports to be a continuation-in-part of U.S. Patent Application No. 12/369,406, filed on February 11, 2009.

18.  Rachmiel and Weiss filed the '589 patent pursuant to the USPTO's Accelerated Examination Program (the "Accelerated Program") knowing full well that the purpose of the Accelerated Program is to accelerate the time period during which an examiner substantively examines an application.  The goal of an accelerated application is to obtain final disposition within one year from the date of filing the patent application.

**B.  Applicants' Additional Obligations Under The Accelerated Program**

19.  In exchange for the accelerated timeframe in which the patent application is examined under the Accelerated Program, Weiss and Rachmiel were required to meet certain additional requirements above and beyond the standard requirements for a non-accelerated application.

20.  These additional requirements shift responsibility to the applicant for certain tasks associated with examination such that the patent examiner's investigative burden is lessened.

21.  For example, under the Accelerated Program, an applicant is required to perform extensive prior art searches using relevant search terms prior to the filing of an accelerated application and must identify to the USPTO the prior art which is "most closely related" to the invention.

22.     Rather than the USPTO solely conducting research to determine what prior art might be applicable to the application, applicants seeking an accelerated determination are charged with the responsibility of advising the USPTO of the "most closely related" prior art.

**C.     Applicants' Duty Of Disclosure, Candor, And Good Faith**

23.     As with any patent application, the Accelerated Program is fully dependent upon the honesty and integrity of the applicant to ensure that any relevant information is timely disclosed to the USPTO, thereby allowing the USPTO to make an informed decision on the filed patent application.

24.     The language of 37 C.F.R. § 1.56 in effect in 2011, entitled Duty of Disclosure, Candor, and Good Faith, provides that:

> Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [USPTO], which includes a duty to disclose to the [USPTO] all information known to that individual to be material to patentability as defined in this section. The duty to disclose information exists with respect to each pending claim until the claims is cancelled or withdrawn from consideration, or the application becomes abandoned.

25.     "Individuals associated" with the filing and prosecution of a patent application include: (i) each inventor named in the application; (ii) each attorney or agent who prepares or prosecutes the application; and (iii) every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application. 37 C.F.R. § 1.56 (2011).

**D.**     **Sworn Documents Submitted By Applicants To The USPTO**

26.     As part of the Accelerated Program, on July 22, 2010, Rachmiel and Weiss submitted a "Pre-Examination Search Statement and Accelerated Examination Support Document" to the USPTO.  This document contained, *inter alia*:

       (a)     A listing of claims;

       (b)     A listing of references deemed most closely related to the invention and claims of the patent application; and

       (c)     A detailed explanation of patentability.

27.     The Pre-Examination Search Statement and Accelerated Examination Support Document contained a sworn declaration executed by both Rachmiel and Weiss dated October 13, 2009.  Under the sworn declaration, each Rachmiel and Weiss attested that:

> I acknowledge the duty to disclose all information known to me that is material to patentability as defined by Title 37, Code of Federal Regulations, § 1.56. … I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued therefrom.

28.     Under the Pre-Examination Search Statement and Accelerated Examination Support Document's listing of references deemed "most closely related" to the invention, Rachmiel and Weiss listed two references: U.S. Patent Publication No. 2006/0041558 ("McCauley") and Cognos 8 Business Intelligence, "Architecture and Planning Guide."

29.     Following the successful petition for accelerated examination, on December 15, 2010, the USPTO issued its first office action rejecting all claims of the application.

30.     On January 18, 2011, in connection with the response to such office action, Rachmiel and Weiss submitted a *Supplemental* Accelerated Examination Support Document but again only identified McCauley and Cognos 8 Business Intelligence, "Architecture and Planning Guide" as most closely related.

31.     Thereafter, on March 28, 2011, Rachmiel and Weiss submitted a *Second* Supplemental Accelerated Examination Support Document. In addition to adding one reference identified in another application, Rachmiel and Weiss again identified McCauley and Cognos 8 Business Intelligence, "Architecture and Planning Guide."

**E.     Fraudulent Conduct And Deceit With Respect To The USPTO**

32.     As discussed in detail below, Rachmiel and Weiss, despite having demonstrable knowledge of their existence and materiality: (a) deliberately selected search terms in order to exclude the most relevant prior art; and (b) on at least 3 occasions, failed to identify as "most closely related" Motio's MotioCI product or Cognos documentation highly material to the subject matter of the '589 patent.  Rachmiel and Weiss at all times material knew of the existence of the MotioCI product and the Cognos documentation.

33.     In addition, Rachmiel and Weiss attempted to cover-up their knowledge of Motio's highly relevant version control product at the purported conception date of the claimed invention by doctoring chat logs and deleting references to Motio and Motio's product found originally in the chat logs submitted to the USPTO in response to the examiner's rejection of the application.

### *(1)  Rachmiel's and Weiss' Demonstrable Knowledge Of The Intentionally Withheld Information*

34.     Rachmiel and Weiss had demonstrable knowledge of critical information that was intentionally withheld from the USPTO in order to obtain the '589 patent.

16

35.     The "invention" described in the '589 patent purportedly covers software to optimize IBM's Cognos Business Intelligence software ("Cognos"), including version control for Cognos.

36.     Both Rachmiel and Weiss are former employees of Cognos Corporation and have intimate knowledge of Cognos.

37.     The specification and figures for the '589 patent uses the term "Cognos" on at least 40 occasions.

38.     Version control for Cognos is a central and marquis feature of Motio's preexisting product, MotioCI.

39.     Prior to filing the Accelerated Examination Support Document and continuing to the present, Rachmiel had detailed and demonstrable knowledge of the MotioCI product and at all times material knew that version control was a central feature of the MotioCI product.

40.     Indeed, prior to BSP's fraudulent pursuit of the '589 patent and its sham litigation against Motio, BSP worked cooperatively with Motio to market the MotioCI product with the touted version control feature.

41.     Specifically, in April 2006, Motio and BSP collectively marketed the MotioCI product in an effort to obtain business from Klein Tools.

42.     In an email from Rachmiel to Klein Tools dated April 17, 2006, Rachmiel specifically touted the MotioCI product by stating that "the version control is so powerful . . ."

43.     In August 2007, Motio negotiated a deal with Rachmiel to run a MotioCI advertisement on COGNOiSe, a Cognos internet discussion forum site owned and operated by BSP.

44.     The first description of the MotioCI product described in the advertisement on the BSP owned and operated COGNOiSe site was: "Version Control for Cognos."

45.     In September 2007, Rachmiel directly participated with Motio in making a joint proposal to Pharmerica that included the version control functionality of the MotioCI product.

46.     In an email to Motio dated September 25, 2007, Rachmiel wrote in part:  "I have not quoted [Pharmerica] on pricing.  We demo'd on 9/12 and the last we spoke was on the 13th when we talked about version control . . ."

47.     In January 2008, while discussing potential business opportunities with Alberta Education, Motio directly informed Rachmiel that Alberta Education intended to purchase the version control portion of the MotioCI product.

48.     In an email dated January 31, 2008 from Motio to Rachmiel, Motio stated: "Just FYI [Alberta Education is] about to buy the version control of our tool."

49.     Rachmiel responded to the January 31, 2008 email that same day, stating in part: "Great e-mail.  I owe you a call."

50.     In June 2008, Rachmiel directly inquired in an instant message conversation with Motio: "can I ask you a question regarding your version control app?"

51.     With regard to the "version control app," Rachmiel went on to inquire: "It intercepts the save request when a user in in [sic] RS Right?", thereby demonstrating his knowledge of what the MotioCI product does and how it works.

### (2)  *Deliberate Selection of Search Terms Designed to Exclude Prior Art*

52.     On July 22, 2010, Rachmiel and Weiss submitted a Pre-Examination Search Document to the USPTO and verified that the statements contained therein were true.

53.     The Pre-Examination Search Document provides that "[a] pre-examination search was conducted involving U.S. patents and patent application publications, foreign patent documents and **non-patent literature** . . ."

54.     The Pre-Examination Search Document further provides that "[t]he pre-examination search was directed to the claimed invention, encompassing all the features of the claims and giving the claims their broadest reasonable interpretation."

55.     Notwithstanding these representations and Rachmiel's and Weiss' clear and demonstrable knowledge and understanding of Cognos and the MotioCI product, as well as the fact that there are at least 38 references to "Cognos" and at least 19 references to "JavaScript" in the '589 patent specification and examples, the Applicants' Pre-Examination Search **did not** include the most basic search terms of: "Cognos," "Motio," "MotioCI," or "Javascript."

56.     The failure to use these most basic search terms to locate the prior art actually relevant to the "invention" claimed in the '589 patent had the effect of deceiving the USPTO through skewed, inaccurate, and incomplete search results.

57.     Rachmiel and Weiss, by reason of their clear knowledge and understanding of actual material prior art to the '589 patent, intentionally and willfully excluded relevant search terms in order to deceive the USPTO and obtain the '589 patent based on incomplete and inaccurate information.

### (3) *Intentional Failure to Disclose Cognos Documentation to the USPTO*

58.     Rachmiel and Weiss, at all relevant times, had knowledge and an understanding of the documentation that is included with a Cognos software installation, including but not limited to: (a) Cognos 8.3 "Administration and Security Guide"; (b) Cognos 8.3 "Report Studio, Professional Authoring User Guide"; (c) Cognos 8.3 "Framework Manager User Guide"; and (d) Cognos 8.3 "Query Studio User Guide."

19

59.     Notwithstanding such knowledge and understanding of Cognos as described above, each of these highly material references were intentionally withheld by Rachmiel and Weiss from disclosure to the USPTO.

60.     Rather than disclosing any of the above-referenced Cognos documentation, Rachmiel and Weiss intentionally chose to disclose only a non-material portion of the Cognos documentation while withholding the highly material portions of such Cognos documentation.

61.     In contrast, a named inventor of the other patent-in-suit and former co-owner of BSP, Morgan, confirmed his knowledge that the Cognos 8.3 "Administration and Security Guide" is a known resource that discloses methods/techniques for modifying the user interface of Cognos, including but not limited to adding or removing toolbar buttons or menu items to a Cognos authoring user interface (such methods/techniques are highly material to independent claims 1 and 11 of the '589 patent).

62.     In fact, Cognos provided the "Administration and Security Guide" in the same Cognos install directory as the "Architecture and Planning Guide" disclosed by Rachmiel and Weiss and cited as the reference deemed "most closely related."

63.     Rachmiel and Weiss intentionally failed to disclose the above-described Cognos documentation to the USPTO during prosecution of the application that matured into the '589 patent with the intent to deceive the USPTO and obtain the '589 patent based on incomplete and inaccurate information.

### (4)  *Failure to Disclose Cognos Training and Presentation Materials*

64.     Rachmiel and Weiss had direct knowledge of highly material prior art references from 2004 Cognos training materials titled "Custom Toolbars and Menus in Query Studio v1.1.doc" yet failed to disclose it to the USPTO.

65.     In an email dated January 5, 2004, Morgan, a co-founder of BSP, disclosed to Lance Hankins, a co-founder of Motio, a document titled "Custom Toolbars and Menus in Query Studio v1.1.doc."  Morgan was still employed by Cognos Corporation in January 2004.

66.     The "Custom Toolbars and Menus in Query Studio v1.1.doc" reference discloses known methods/techniques for customizing the user interface of Cognos Query Studio by, *inter alia*, adding new buttons to Query Studio and overriding the behavior of default Query Studio buttons like save (e.g., "In this example, we will modify the save button to call a custom save function.  For example, we wish to add new code to create an entry in our portal as well as in Cognos ReportNet.").

67.     The "Custom Toolbars and Menus in Query Studio v1.1.doc" reference is highly material to at least independent claim 1 of the '589 patent, which includes the limitation: "wherein the browser is further directed by second browser textual instructions referenced by the first browser textual instructions and configured to modify the authoring user interface by integrating change management functionality into the authoring user interface to allow the change management server to manage storage of the metadata indicative of the report definition."  The reference is also highly material to independent claim 11, which includes a similar limitation.

68.     Rachmiel and Weiss had direct knowledge of a highly material prior art reference from 2002 titled "CRN Integration Lecture.ppt" yet failed to disclose it to the USPTO.

69.     One of the named inventors of the other patent-in-suit and a former co-owner of BSP, Danielewski, admitted that he had the document titled "CRN Integration Lecture.ppt" in his possession continuously since at least early 2004 when he was employed by Cognos Corporation.  Further, it is admitted that this document and other Cognos training and

presentation materials were available on a BSP shared drive prior to and during prosecution of the '589 patent.

70.     The "CRN Integration Lecture.ppt" reference discloses known methods/techniques for customizing the user interface of Cognos Query Studio by, *inter alia*, adding new buttons to Query Studio and overriding the behavior of default Query Studio buttons like save.

71.     The "CRN Integration Lecture.ppt" reference is highly material to at least independent claims 1 and 11.

72.     Notwithstanding the direct knowledge of these highly material prior art references, Rachmiel and Weiss intentionally failed to disclose such references to the USPTO with the intent to deceive the USPTO and obtain the '589 patent based on incomplete and inaccurate information.

### (5) *False and/or Misleading Statements to the USPTO*

73.     In multiple instances, Rachmiel and Weiss made false and/or misleading statements in sworn statements to the USPTO.  Such false and/or misleading statements were material to patentability and intended to deceive the USPTO.

74.     Rachmiel and Weiss intentionally misrepresented the version control functionality contained in Motio's MotioCI product during prosecution of the '589 patent.

75.     In the "Declaration of Andrew G. Rachmiel Under 37 C.F.R. § 1.132" executed by Rachmiel and filed with the USPTO on January 18, 2011, Rachmiel represented to the USPTO that:

> Failure of Others
>
> 22. The positive reaction from the marketplace to the IVC product led a competitor, Motio, Inc. ("Motio"), to re-purpose a product originally directed to regression and stress testing of Cognos

systems. The storage of previous versions of Cognos reports was a byproduct of the regression and stress tests of its MotioCI product. After BSP Software released the IVC product, Motio began marketing a version control-only variant of its MotioCI product.

76.     Notwithstanding the above Declaration executed by Rachmiel and filed with the

USPTO, Rachmiel knew that version control was a critical and marquis feature of MotioCI and

that Motio offered a version control-only variant of its MotioCI product well before February 11,

2009, the earliest possible filing date that can be claimed in the '589 patent (and also well before

December 29, 2008, the date on which Rachmiel claimed to the USPTO that BSP's Integrated

Content Manager (later renamed to Integrated Version Control or IVC) "was in the midst of

testing").

77.     Examples demonstrating Rachmiel's undeniable knowledge of the falsity of his

above Declaration include, but are not limited to:

(a)     In April 2006, as part of an effort to obtain business from Klein Tools, Rachmiel directly informed Lance Hankins and Lynn Moore of Motio that "the open-ness of the [RCL CI] product (monitoring other DBs, etc.) and the version control is so powerful, they see an immediate need despite adoption of the environment." Rachmiel's comment came after Lance Hankins demonstrated the Motio software to Klein Tools (with Rachmiel in attendance).

(b)     In May 2007, as part of an effort to obtain business from Simon Property Group, Rachmiel directly informed Lance Hankins of Motio that "they have a need for version control and the ability to compare two report versions, which is all you guys [Motio]."

(c)     In August 2007, Motio (then known as Focus Technologies) placed a paid advertisement for its FocusCI product on the COGNOiSe Internet forum owned and hosted by BSP. The first feature bulletpoint of the FocusCI advertisement placed on BSP's COGNOiSe Internet forum stated "Version Control for Cognos."

(d)     In September 2007, Rachmiel directly participated with Motio (then known as Focus Technologies) in making a joint proposal to Pharmerica that included a MotioCI pricing option for a Level 1 configuration that included only version control functionality and not testing functionality.

23

(e)      In January 2008, while discussing potential business opportunities at Alberta Education, Charles Bowen of Motio directly informed Rachmiel that "Just FYI they are about to buy the version control portion of our tool." Rachmiel acknowledged the statement with a reply email on the same day, stating in part: "Great email. I owe you a call."

(f)      In June 2008, Rachmiel directly inquired in an instant message conversation with Mr. Hankins "can i ask you a question regarding your version control app?"

(g)      In October 2008, at the IBM Information On Demand Conference, Motio displayed large booth banners listing "Integrated Version Control" as the headline marketing bullet for MotioCI.

78.     Rachmiel and Weiss further intentionally misrepresented and/or omitted the version control functionality contained in Motio's MotioCI product in the specification of the '589 patent.

79.     In the "Brief Description of Related Technology" in the "Background of the Disclosure" section of the '589 patent, Rachmiel and Weiss represent that:

> Commercially available software has attempted to preserve previous versions of IBM Cognos object definitions by automatically inspecting the IBM Cognos system on a periodic basis to determine if any object definitions have changed since the previous inspection. If a definition has changed, the object definition is captured and stored as a new version of the object. Further details regarding the software may be found in U.S. Patent Publication No. 2007/0174069. However, periodic inspections may fail to capture intermediate revisions." '589 patent, col. 2, ll. 39-48.

80.     Notwithstanding the above statement describing the purported drawbacks of the software commercially available at the time of filing the patent application, Rachmiel knew that the MotioCI product included active version control, in addition to the periodic (or polling) version control described in the '589 patent.

81.     For example, in an instant message conversation on June 11, 2008 (approximately eight months before the parent application for the '589 patent was filed), Rachmiel directly stated to Lance Hankins of Motio that:

> "(4:16:18 PM) agrachmiel: can i ask you a question regarding your version control app?
>
> …
>
> (4:13:55 PM) agrachmiel: It intercepts the save request when a user is in RS, right? It captures the XML and saves the old one as a version? Did you modify the RS code to do it?"
> …
> (4:17:04 PM) agrachmiel: not sure if we can change how RS works, but I starting [sic, started] thinking that I believe you guys do because your versioning captures specs as they change so you can revert back."

### (6)  Submission to the USPTO of Fraudulently Doctored and Fabricated Chat Logs

82.     In addition to knowingly and willfully: (a) withholding critical information from the USPTO; and (b) making false and misleading statements to the USPTO; Applicants also submitted doctored and fabricated chat logs to the USPTO in order to obtain the '589 patent unlawfully.  (Attached hereto as Exhibit A copies of emails contained the doctored and fabricated chat logs).

83.     Following the successful petition for accelerated examination, on December 15, 2010, the USPTO issued its first office action rejecting all claims of the application, stating that the claims are obvious when considering the following prior art in combination: (i) Cognos "Architecture & Planning Guide (2006); (ii) McCauley (2006); and (iii) Needamangala (March 2008).

84.     In response to the USPTO's rejection of all claims of the application, Rachmiel and Weiss responded by arguing that Needamangala should not be considered prior art and claiming the invention was conceived before the Needamangala publication date.

85.     In support of this argument, Rachmiel and Weiss submitted a sworn "Declaration of Inventors under 37 C.F.R. § 1.131" executed by both Rachmiel and Weiss on January 18, 2011.

86.     The stated purpose of the Declaration was to provide "evidence regarding (i) the conception of the claimed subject matter before the Effective Date, and (ii) the diligence of BSP Software to reduce the claimed invention to practice."

87.     In executing the Declaration, both Rachmiel and Weiss attested that:

> I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001 and that such willful false statements may jeopardize the validity of the above-referenced patent application and any patent issued therefore.

88.     What was represented to be an Instant Messenger Chat Session between Rachmiel and Weiss was attached as Exhibit A to the sworn Declaration.

89.     The Instant Messenger Chat Session submitted by Rachmiel and Weiss was represented to be "[t]he substance of the chat session [that] was recorded in a chat log by the Microsoft Windows Live™ Messenger service as XML data, an excerpt of which has been arranged in a tab-delimited table attached as Exhibit A."

90.     The Instant Messenger Chat Session was offered by Rachmiel and Weiss as evidence that the conception of subject matter claimed in the '589 patent was before the effective date of a reference cited by the USPTO in rejecting the application.

26

91.     The Instant Messenger Chat Session, however, was fraudulently doctored and altered by Rachmiel and Weiss in order to deceive the USPTO.

92.     **First**, the Instant Messenger Chat Session submitted to the USPTO was manually edited to remove all reference to Motio and MotioCI, Motio's highly relevant version control product.

93.     Specifically, Rachmiel and Weiss removed the following statements from the Instant Messenger Chat Session submitted to the USPTO:

> Rachmiel:  Did you look at the motio ci website that I was talking about yesterday
>
> Weiss:   Yes.   their approach seems very technical and admin savvy.  If we're going to be competitive we need to target the end users and make it look/feel like Cognos.
>
> Rachmiel:  Agreed. . . .
>
> Weiss:  . . . . I have some ideas.

94.     Telling of Rachmiel's and Weiss' intent to deceive the USPTO and to make the incomplete Instant Messenger Chat Session appear complete, Rachmiel and Weiss further removed additional non-material words and phrases so the doctored conversation makes sense, appears to flow naturally, and provides no indication that material portions of the conversion were deleted.

95.     **Second**, Rachmiel and Weiss fraudulently manufactured fake conversations to make it appear as though they had in fact "conceived" the claimed invention prior the Effective Date.

96.     To be clear, an entire portion of the Instant Messenger Chat Session was **completely fabricated** by Rachmiel and Weiss – a chat conversation made up out of whole cloth in order to swear behind the Needamangala publication date.

97.     Specifically, the completely fabricated section of the Instant Messenger Chat Session is the portion dated February 20, 2008 at 6:03:15 p.m. to February 20, 2008 at 6:40:26 p.m.  The entire section was written by Rachmiel and Weiss well after the fact to make it appear as though the invention claimed in the '589 patent was conceived just prior to the Needamangala publication date.

98.     It is no coincidence that the fabricated section of the Instant Messenger Chat Session was fraudulent and falsely dated February 20, 2008.  That date conveniently falls just before the Needamangala publication date of March 2008

99.     By, *inter alia*, using the above-identified scheme to defraud the USPTO, Rachmiel and Weiss committed affirmative egregious misconduct.

### *(7)  Non-Cumulative, Materiality, and Intent to Deceive*

100.     The above-described prior art materials were not cumulative of the information cited during prosecution of the application that matured into the '589 patent.  Indeed, the above-described prior art materials were considerably more material than any references cited during prosecution of the application that matured into the '589 patent notwithstanding Rachmiel's and Weiss' duty to identify the "most closely related" prior art under the Accelerated Program.

101.     The above-described false and/or misleading statements to the USPTO were highly material to the patentability of one or more claims of the '589 patent.

102.     The above described fraudulent and doctored Instant Messenger Chat Session was highly material to the patentability of one or more claims of the '589 patent.

103.     Rachmiel and Weiss knew that issuance of the '589 patent was critical to BSP's ability to survive and monopolize the market.

104.     Considering: (a) the "but for" materiality of one or more of the above-described prior art materials; (b) Rachmiel's and Weiss' awareness and knowledge of such prior art

28

materials; (c) the "but for" materiality of one or more of the above-described false and/or misleading statements to the USPTO; (d) the "but for" materiality of the fraudulently doctored Instant Messenger Chat Session; and (e) Rachmiel's and Weiss' knowledge that the issuance of the '589 patent was critical to BSP's business and ability to monopolize the market; the single most reasonable inference to be drawn from the above-described actions or omissions is that one or more of the named inventors and/or the attorney(s) prosecuting the application that matured into the '589 patent intended to deceive the Examiner during prosecution of the application that matured into the '589 patent.

105.    Accordingly, the '589 patent is unenforceable because of inequitable conduct committed by one or more of the named inventors and/or one or more of the attorney(s) prosecuting the application that matured into the '589 patent.

**F.    Weiss And BSP Compliment Their Fraudulent Conduct After Issuance Of The '589 Patent With A Vulgar Celebration**

106.    Lest there be any doubt regarding Rachmiel's, Weiss' and BSP's nefarious and fraudulent conduct, and the intent of each to deceive the USPTO in order to illegally monopolize the market, a brief description of BSP's "celebration" upon being granted the '589 patent is in order.

107.    The '589 patent was issued by the USPTO on May 17, 2011.

108.    Upon receiving the news the USPTO had issued the '589 patent, BSP promptly adorned a t-shirt with the phrase "MUCK FOTIO."

109.    These t-shirts were obviously made to congratulate themselves on perpetrating a fraud on the USPTO and in fraudulently acquiring a monopoly on the relevant markets.

110.    Such celebration reveals BSP's continued attempts to MUCK FOTIO, first by its unlawful conduct before the USPTO, and now through this sham litigation.

29

**G.**     **Applicants' Pattern And Practice To Conceal The Fraudulent Conduct**

111.    After BSP obtained the '589 patent via fraud on the USPTO, Rachmiel, Weiss and BSP engaged in a pattern and practice to conceal the fraudulent conduct from Motio and to obfuscate the discovery process.

112.    Although requested through discovery, BSP did not produce the doctored and fabricated chat log it submitted to the USPTO nor any additional chat logs which were responsive to Motio's document requests.

113.    Upon inquiry, on June 3, 2013, BSP, through its counsel, represented that: "there are no IM Chat logs for BSP to produce.  We expect that this will settle Motio's concern."

114.    On June 10, 2013, about a week after it stated that no chat logs existed, BSP recanted, stating for the first time that it had identified "a number of IM chat logs."  BSP provided no explanation as to why the chat logs had not been produced previously.

115.    Thereafter, on July 11, 2013, after the June 28, 2013 close of fact discovery, BSP produced over 3,700 pages of IM chat logs it previously represented did not exist.

116.    However, without any explanation, the chat logs BSP eventually produced **did not** contain a copy of the chat logs submitted as part of the sworn declaration to the USPTO during the prosecution of the '589 patent.

117.    As a result of BSP's concealment of the fraudulent chat logs, Motio was forced to obtain the pertinent chat logs from a third-party - Team Tech Systems, Inc. ("Team Tech").

118.    As part of BSP's ongoing pattern and practice to conceal the fraudulent conduct, BSP did not disclose Team Tech to Motio in its: (a) Initial Disclosures as required by Fed. R. Civ. P. 26(a)(1); (b) Supplemental Initial Disclosures; and (c) answers to Motio's interrogatory which sought a detailed description of "all design and development activities, by or on behalf of

Plaintiff, relating to the subject matter of any claim of any Asserted Patent or any Related Patent including the Persons involved…"

119.    BSP failed to disclose Team Tech to Motio notwithstanding that Team Tech had a substantial role in the development of BSP's MetaManager – a BSP product purportedly covered by the patents-in-suit.

120.    To wit, Motio later learned, independent of BSP, that Team Tech, through Weiss, was involved in the development of BSP's MetaManager product.

121.    After serving Team Tech with a subpoena, Team Tech, through its attorneys at Greenberg Traurig, produced over 14,000 pages of documents.

122.    Contained within this large production by third-party Team Tech were image files of emails between Rachmiel and Weiss relating to their search for the chat logs during December 2010.

123.    Many of the emails between Rachmiel and Weiss were not produced by BSP in this litigation and only produced by third-party Team Tech.

124.    The attachments to these emails contained parts of the chat logs submitted to the USPTO by BSP.  (*See* Exhibit A).  These emails are dated approximately three weeks before BSP filed its January 18, 2011 response to the USPTO containing the doctored and fabricated IM chat logs.  *Id.*

125.    As part of the pattern and practice to conceal the fraudulent conduct, Rachmiel and Weiss further obfuscated the discovery process by creating and using numerous alias email accounts.  (*See* Exhibit A).

126.    These alias email accounts were used by at least Rachmiel and Weiss to have discussions regarding the prosecution of the '589 patent and the doctored chat logs.

127.    Notwithstanding the critical importance of these emails, BSP and Avnet have failed to produce any emails from these alias emails accounts.

**H.    BSP's And Avnet's Conspiracy To Monopolize The Marketplace**

128.    In November 2012, Avnet completed the purchase of Plaintiff BSP.

129.    As part of the purchase, Avnet obtained ownership of the patents-in-suit and all rights associated with such patents.

130.    Upon information and belief, at all times material herein, Avnet was aware that the '589 patent was acquired through fraudulent and inequitable conduct on the USPTO.

131.    Upon information and belief, prior to closing of the purchase in November 2012, BSP represented to Avnet that if successful in the above-captioned lawsuit, Avnet would obtain a monopoly in the marketplace for products that offer version control features for IBM's Cognos Business Intelligence software and in the marketplace for products that offer administrative tools for IBM's Cognos Business Intelligence software.

132.    Avnet jumped at the opportunity to monopolize, completed the acquisition of BSP, and has continued to pursue this sham litigation and tout the fraudulently obtained '589 patent in the marketplace.

133.    Since making BSP its wholly-owned subsidiary, Avnet has continued to attempt to monopolize and drive Motio out of the marketplace.

134.    By way of example, Avnet is currently advertising BSP's MetaManager product on its website.  (A copy of the advertisement found on Avnet's website is attached hereto as Exhibit B).

135.    In the advertisement, Avnet touts its size and sales, describing itself as a Fortune 500 company, with $26 billion in annual sales and with over 17,500 employees.

136.    In the advertisement, Avnet further touts the purported various features of BSP's MetaManager product.

137.    Importantly, the advertisement contains side-by-side comparisons of Avnet to its only competitor in the marketplace for products that offer version control and administrative tools for IBM's Cognos Business Intelligence software – Motio.

138.    The advertisement makes a mocking reference to Motio by showing an iteration of Motio's mascot (the "Cognos Ninja") along with the phrase: "Look At What Our Competitors Forgot To Mention."

139.    The advertisement provides citation through clickable links to a Dun & Bradstreet report for Motio, as well as a Hoovers report for Motio.

140.    The bottom of the advertisement contains a side-by-side comparison of Motio to BSP.  In contrast to Avnet's description of itself as a $25 billion company with tens of thousands of employees, Avnet describes Motio as having a mere $2 million in sales and only 25 employees.

141.    The portion of the advertisement describing Motio's statistics again shows an iteration of Motio's mascot, the Cognos Ninja.

142.    Telling of the lack of competition in the marketplace aside from Avnet and Motio, the advertisement does not list any "competitor" other than Motio.

143.    Moreover, in the "MetaManager Competitive Tour" section of its website, Avnet again provides a side-by-side comparison between itself and Motio, stating that: "If you're going to partner with an organization and trust your environment into their product's hands, you want to know that the vendor will be around for the long haul."  (A copy of the MetaManager Competitive Tour Section of Avnet's website is attached hereto as Exhibit C).  This is clearly an

implication that Motio may not be around for the long haul and will be crushed by the $26 billion juggernaut Avnet.

144. This section goes on to read that the "marriage" between Avnet and BSP "will enhance the depth and breadth of our IBM software and service capabilities, proving the expertise that our customers need."

145. This section concludes with: "As for our competitors. Well . . . ," followed by a comparison of Avnet's multibillion dollars in sales to Motio's $2 million in sales.

146. The advertisement makes no reference to any other "competitor" besides Motio.

## II.  FACTS REGARDING THE '863 PATENT

### A.  Prosecution Of The '863 Patent And The Duty Of Disclosure, Candor, And Good Faith

147. On December 26, 2007, named inventors Rachmiel, Morgan, and Danielewski filed the application that ultimately matured into the '863 patent when it issued on December 6, 2011.  The '863 patent purports to claim the benefit of U.S. Provisional Patent Application No. 60/889,455, which was filed on February 12, 2007.

148. Pursuant to 37 C.F.R. § 1.56, applicants for U.S. patents and their representatives before the USPTO are subject to a duty of candor, good faith, and honesty in their prosecution of patent applications.

149. The language of 37 C.F.R. § 1.56 in effect in 2011, entitled Duty of Disclosure, Candor, and Good Faith, provides that:

> Each individual associated with the filing and prosecution of a patent application has a duty of candor and good faith in dealing with the [USPTO], which includes a duty to disclose to the [USPTO] all information known to that individual to be material to patentability as defined in this section.  The duty to disclose information exists with respect to each pending claim until the claims is cancelled or withdrawn from consideration, or the application becomes abandoned.

150.    "Individuals associated" with the filing and prosecution of a patent application include: (i) each inventor named in the application; (ii) each attorney or agent who prepares or prosecutes the application; and (iii) every other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, with the assignee or with anyone to whom there is an obligation to assign the application.  37 C.F.R. § 1.56 (2011).

**B.    <u>Sworn Documents Submitted To The USPTO</u>**

151.    On March 31, 2008, a declaration was filed in connection with the application that matured into the '863 patent.

152.    The declaration was executed by Rachmiel, Morgan, and Danielewski on February 8, 2008, and stated, *inter alia*:

> I acknowledge the duty to disclose all information known to me that is material to patentability as defined by Title 37, Code of Federal Regulations, § 1.56. … I hereby declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code and that such willful false statements may jeopardize the validity of the application or any patent issued therefrom.

**C.    <u>Failure To Disclose And Inequitable Conduct On The USPTO</u>**

153.    One or more of the named inventors of the '863 patent, having a duty of disclosure, intentionally failed to disclose material, non-cumulative prior art to the USPTO during prosecution of the '863 patent that would have rendered one or more claims of the '863 patent invalid.

154.    One or more of the named inventors of the '863 patent made willfully false statements to the USPTO during prosecution of the '863 patent.

155.   All claims of the '863 patent are unenforceable because one or more of the named inventors of the '863 patent failed to comply with the duty of disclosure to the USPTO during prosecution of the '863 patent, with the intent to deceive the USPTO.

156.   The following omissions and/or misstatements are examples of separate intentional breaches of the duty of candor, and also collectively evidence a pattern of conduct designed to deceive the USPTO in breach of the duty of candor.

### (1)  Failure to Disclose the ReportCentral (RCL) Product Family Offered by Focus Technologies, Inc. (Later Known As Motio, Inc.)

157.   BSP was formed in 2006 as a spin-out of BrightStar Partners, for the purpose of becoming the software development arm of BrightStar Partners.

158.   In the 2005 timeframe, BSP and Motio (then known as Focus Technologies, Inc.) worked together to market and to sell Motio's products, including the ReportCentral (RCL) product line.

159.   As a result, Rachmiel, Morgan, and/or Danielewski were aware of the functionality of the RCL product line in 2005; however, neither the RCL product line nor its functionality were disclosed to the USPTO in connection with the prosecution of the '863 patent.

160.   One feature included in the RCL product line in 2005 was the Edit Profile Wizard (also known as the Template Wizard), which is a user interface provided by RCL to allow users to create and/or edit Report Profiles.

161.   Using the Edit Profile Wizard, RCL stores the user's selections as a property of the edited Report Profile in XML format.  The Report Profile is then stored in the RCL metadata repository.  A user may then select and execute one or more Report Profiles from the RCL user interface.  This launches in batch the collection of selected Report Profiles in the RCL execution pipeline.

162.     The steps taken to execute each of these Report Profiles include retrieving and modifying the original report specification, saving and executing the modified report specification, and storing the original and modified report specifications, in XML format, in the RCL database.

163.     The RCL product family, and its functionality, is highly material to most claims of the '863 patent, including:

(a)     Independent claim 1, which includes the element: "a content editor … to modify in a batch job the XML metadata content for each XML metadata content object of the selected group for storage of the modified XML metadata content in the metadata repository."

(b)     Independent claim 14, which includes the element: "modify in a batch job the XML metadata content for each XML metadata content object of the selected group for storage of the modified XML metadata content in the metadata repository."

(c)     Independent claim 23 and dependent claims 10, 21, 24, 25, 26, 27, and 29-38, all of which include one or more elements directed toward validation of XML metadata content objects.

164.     In April 2005, Motio made a public presentation about the RCL product at the Chicago Cognos User Group meeting hosted at the Blistex facility.

165.     Morgan was one of the organizers of the April 2005 Chicago Cognos User Group meeting.

166.     Morgan invited Lance Hankins ("Hankins") of Motio to attend and present materials on the RCL framework.

167.     As requested, Hankins made a presentation that included an overview of the RCL framework product for building custom applications in Cognos, including at least the following:

(a)     "Do you need to extend the CRN meta data?"

(b)     "CRN Metadata to Object Mapping – provides developers with programmatic, object oriented access to CRN Metadata"

(c)     "Metadata Extension – ability to modify and extend the CRN metadata (i.e. Report & Query item with your own Application Specific Information) for customized processing"

(d)     "Utilities – helps streamline CRN development by adding tools such as Version Control Helper for Report Specs, Unit Tester for Report Specs, and Model Printer"

(e)     "Report Wizard – a simplified alternative to Query or Report Studio that provides the end-user with a more controlled, data driven walkthrough for the creation of new reports"

(f)     "Template Wizard – dynamically modify existing CRN Report specifications"

168.    At least Morgan and Danielewski attended the presentation by Hankins at the April 2005 Chicago Cognos User Group meeting.  In fact, Morgan congratulated Hankins and Lynn Moore ("Moore") of Motio on a job well done and reminded them he planned to introduce Motio (t/k/a Focus Technologies) and the RCL Framework to Manpower and Assurant.

169.    In April 2005, Morgan was aware of the RCL product line and its functionality through his participation in marketing efforts with Manpower, Inc. ("Manpower").

170.    On April 20, 2005, as part of a joint effort of BSP and Motio to market the RCL product line to Manpower, Morgan transmitted an email to Christopher Phelps ("Phelps") of Manpower scheduling an "RCL presentation" to be conducted via WebEx with an agenda that included:

(a)     "1. Overview of what the RCL is, how it relates to Cognos ReportNet, and why it's so important.

(b)     2. Cognos Connection – We'll take a quick look at how users currently use Cognos Connection to navigate to reports.

(c)     3. RCL Skeleton Web Application – Examine a prebuilt web application that is part of the RCL and examine some of its key features such as ad-hoc.

(d)     4. CARS – Demonstrate more of the RCL features and the high degree to which the end-user experience can be customized.

(e)     5. Integration – Examine how applications built using the RCL can be integrated into existing web applications including the integration of security.

(f)     6. Questions.

This presentation is designed to build upon itself from demonstrating the generic Cognos interface, to an RCL-provided skeleton application that extends the user experience and capabilities, and finally landing on the quite extraordinary interface of the CARS application.

171.    On April 21, 2005, after the WebEx presentation, Phelps of Manpower thanked Morgan (as well as Hankins and Moore of Motio) "for the overview today." Phelps explained: "I expect to have some questions by the end of the week so lets expect to talk early next week. Thanks for the demo! I think it was just what we needed to get someone to spend some money."

172.    On May 3, 2005, Phelps of Manpower posed several questions to Morgan regarding the RCL WebEx presentation, including: "What are the benefits of going down the RCL route as opposed to 'Cognos Connection'?" and "Lance kept referring to 'Cognos Meta Data Layer' yesterday – can you explain what this is to me in simple terms?" Phelps further requested a formal proposal and suggested a meeting between Morgan and the Manpower purchasing group.

173.    On May 9, 2005, Morgan emailed to Phelps an "attached document [that] contains the responses to your questions." Among other things, the attached document included the following answers to Phelps' questions about the benefits of RCL as well as the "Cognos Meta Data Layer":

(a)     "The RCL also provides additional features such as enabling end users to extend existing reports (or create new ones) using a wizard style interface, the ability to manage report outputs outside of the Cognos Content Store (which is important for large scale deployments), and hooks which allow customers to implement custom business logic around the various features exposed via ReportNet."

(b)     "The Cognos Metadata Layer in ReportNet is the model created by Framework Manager. This model is essentially how ReportNet communicates to the database. It essentially provides a place to define the database joins and to redefine the field names and arrangement into more business-like terms.

(c)     The RCL has the ability to read this information and present the user with an organized list of folders and data fields to choose from when using the wizard to build reports. This is a very powerful feature of the RCL as it allows you to provide report creation capabilities to your users without using either Query Studio or Report Studio. Even more impressive is the ability to pull that report back into the wizard to make further changes to the report."

174.    In September 2005, Morgan was provided access to the marketing materials for the RCL product line and its functionality.

175.    On September 26, 2005, Hankins (CTO of Motio) sent an email to Morgan (of BSP) transmitting "the latest (pre-release) marketing information on the RCL family of products." The attached marketing information for the ReportCentral (RCL) Product Family included, among other things, the following:

(a)     "Focus Technologies [Motio] provides a series of products and frameworks designed to augment and extend the award winning Cognos Business Intelligence suite. These products are categorized under the ReportCentral product line (often abbreviated as 'RCL')."

(b)     "RCL-CI provides the following features:

- Need to ensure that all reports are valid after a model change
  …
- Out of the box assertions
  - Assert report(s) are valid (default applied to all)"

(c)     "The RCL Framework is provided as a layered 'stack' . . . RCL-Toolkit – the toolkit layer provides a powerful, object-oriented interface on top of the standard CRN SDK API. Operations such as report generation, report execution, content store management and metadata manipulation can be greatly simplified using the RCL-Toolkit layer."

(d)     "Reference Application: The RCL reference application is a fully functional custom web application which acts as a custom user experience

for Cognos ReportNet. It utilizes the entire RCL stack and demonstrates features such as: . . . Powerful runtime filters and ReportProfiles …"

176. In October 2005, BrightStar Partners sponsored a Cognos marketing event referred to as Chicago Performance Day. Morgan solicited Hankins and Moore to produce a recorded demonstration of the RCL Framework to be marketed at the BrightStar Partners booth.

177. During the event, Hankins and Moore helped man the BrightStar Partners booth, and the recorded demonstration of the RCL Framework was played on a continuous loop on a monitor prominently displayed at the BrightStar Partners booth.

178. In February 2006, Morgan was aware of the RCL product line and its functionality through his participation in marketing efforts with Assurant Health. In particular, Morgan was aware of the RCL Framework product and its use to develop an Extended Job Service functionality to enhance the default Job Service functionality in Cognos Connection.

179. In early 2006, Morgan and Rachmiel and perhaps others at BSP were aware of the RCL-CI product (now called MotioCI) and, more particularly, the RCL-CI functionality for batch validation of Cognos Reports.

180. In March 2006, Motio provided Morgan access to a Motio demo server that hosted live versions of both the RCL and RCL-CI products.

181. In October 2006, Motio made available to BSP an installation of RCL-CI such that BSP could download, install locally, and perform a "partner evaluation" at the BSP facility.

182. In June 2006, the Cognos Forum took place in Las Vegas, Nevada.

183. At the 2006 Cognos Forum, Jason Yeung of Cognos and Moore delivered a presentation entitled "Building BI Applications Using the Cognos SDK."

184. The PowerPoint slides accompanying the Yeung/Moore presentation included a description of the functionality of the RCL and RCL-CI products:

(a)   "Focus Technologies (n/k/a Motio)

- Focus Technologies provides a series of products and frameworks, categorized under the ReportCentral product line (often abbreviated as "RCL"), designed to augment and extend Cognos.

  1)   Application Development Framework (RCL-ADF)
  2)   Continuous Integration Server (RCL-CI)
  3)   Custom Security Provider Framework (RCL-CSP)

- These products enable companies to efficiently bring reliable customized Cognos business intelligence solutions to market.

- A recognized leader in Cognos SDK expertise, Focus has consistently delivered successful Cognos SDK based Business Intelligence solutions for numerous Fortune 500 customers."

(b)   "SDK Business Goals

- Interlace Cognos 8 with Custom Business Logic

- Put a Custom Face on Cognos 8

- Enhance Cognos 8 Functionality

  o   Enhance Report Views
  o   Enhance the Prompt Pages
  o   Guided Tour Through Adhoc Report Creation"

(c)   "Create Utilities/Tools

  o   Command Line Report Execution
  o   Report Validation"

(d)   "Common SDK Uses

- Combining Report Specifications Dynamically at Report Execution

  …
- Manipulating the Framework Manager Model

  o   Exporting the Model to Excel
  o   Batch updating the framework manager model from a database or an excel file

- Batch Manipulation of Content Store

  o   User permissions

42

       o  Creating report views
       o  Report Specifications

- Enhanced Report Views
Add Filters
Manipulate Sorts
Add/Remove report columns
Create fuzzy parameters"

185.    Rachmiel, Morgan, and/or Danielewski attended the 2006 Cognos Forum.

186.    At least Rachmiel and Morgan attended the Yeung/Moore presentation.

187.    One of more of the named inventors of the '863 patent intentionally failed to disclose the existence of the RCL product family and/or its functionality to the USPTO during prosecution of the application that matured into the '863 patent.

### (2)  Failure to Disclose the MyPages Product Family
### and/or Cognos' Development/Ownership of the MyPages Product Family

188.    Beginning at least as early as 2005, BSP made available to the public the MyPages Copy Utility.  Rachmiel, Morgan, and Danielewski were aware of the functionality of the MyPages Copy Utility in 2005; however, neither the MyPages Copy Utility nor its functionality were disclosed to the USPTO.

189.    One feature included in the MyPages product line in 2005 was to allow a Cognos administrator to batch update portal pages for many users (all users that have membership in the selected groups/roles).

190.    The MyPages product line was originally developed by Cognos Corporation (prior to the acquisition of Cognos by IBM) and was referred to as the MyPages Replication Utility.

191.    Rachmiel, Morgan, and Danielewski were employed by Cognos at the time the MyPages Replication Utility was developed by Cognos.

192.    Rachmiel, Morgan, and Danielewski knew that Cognos originally developed the MyPages Replication Utility.

193.    At least one of the named inventors of the '863 patent (Danielewski), while employed by Cognos in or about 2004, provided a Cognos customer with a version of the MyPages Replication Utility.

194.    At least one of the named inventors of the '863 patent (Danielewski) sought permission from Cognos prior to BSP making the MyPages Copy Utility available to the public.

195.    The MyPages product family is material to all issued claims of the '863 patent; however, the MyPages product family is particularly material to the patentability of claim 8 of the '863 patent, which claim was originally asserted by BSP in this litigation but has since been withdrawn.

196.    Claim 8 of the  '863 patent includes the language:

> … wherein the selected group corresponds with a user role, a user class, or a user name of the user web portal of the business intelligence system, and wherein the XML metadata object specifies metadata for user displays of the user web portal associated with the user role, the user class, or the user name of the selected group, after implementation of the batch job.

197.    The MyPages Copy Utility Installation and User Guide made available by BSP includes the language:

> This utility was designed to enable ReportNet Administrators to create custom pages that can be used across one or more user classes (defined in an organization's security source).  A custom page can be developed once and copied to one or more classes of users, providing a more useable custom interface to the product.

198.    Danielewski, a named inventor of the '863 patent, has testified that the functionality disclosed in Figure 15 corresponds to the functionality of the MyPages product family.

199.    Rachmiel is a named inventor in both the '589 patent and the '863 patent, and the same law firm (Lempia Summerfield Katz LLC) handled prosecution of both the '589 patent and the '863 patent.

200.    Notably, the named inventors of the '589 patent, Weiss and Rachmiel (and their law firm), disclosed to the USPTO a reference referred to as "'Installation and User Guide,' MyPages Copy Utility Version 1.0, BrightStar Partners, Inc., 15 pages (2005)" during prosecution of the other patent-in-suit, approximately ten months before issuance of the '863 patent.

201.    Notwithstanding actual knowledge of the MyPages product family and the virtually identical functionality disclosed in Figure 15 of the '863 patent, one or more of the named inventors of the '863 patent intentionally failed to disclose to the USPTO the MyPages "Installation and User Guide" or any other related materials during prosecution of the '863 patent.

202.    One or more of the named inventors of the '863 patent also intentionally failed to disclose to the USPTO any information regarding the original development and/or ownership of the MyPages product family by Cognos Corporation (prior to the acquisition of Cognos by IBM).

### (3)  Failure to Disclose Materials Relating to the Cognos SDK (Software Development Kit)

203.    Rachmiel, Morgan, and Danielewski were aware of the Cognos SDK, including but not limited to Cognos SDK training materials (self-paced, computer-based, advanced courses, and otherwise), typical use cases for the Cognos SDK, and Cognos SDK Samples. However, highly relevant materials relating to the Cognos SDK and its use were intentionally withheld from disclosure and/or mischaracterized to the USPTO.

204.     Rachmiel, Morgan, and Danielewski are former employees of Cognos Corporation and, as such, had knowledge of and/or access to various Cognos SDK training materials before and during prosecution of the '863 patent. For example:

(a)     Danielewski has produced electronic copies of training materials for multiple Cognos training courses that are highly material to the '863 patent and has testified that such training materials were in his possession and also present on a BSP shared drive prior to and during prosecution of the '863 patent, including but not limited to:

- CRN 48.61 -> CRN Basic Course

- CRN 48.61 -> CRN SDK Course

- CRN Advanced Course

- CR1081

205.     In October 2004, Morgan, a named inventor, touted the expertise and knowledge of Danielewski, another named inventor, with the Cognos SDK and training related thereto:

Attached is the resume of Darek Danielewski. To summarize, he was on the BI Advisor team within Cognos. This small team represented the highest skilled, most technical consultants that Cognos had in the field. These people would be brought in for very short-term (two weeks maximum) engagements to solve specific problems or to get a local consulting team pointed in the right direction. He is extremely knowledgeable in ReportNet SDK; in fact he recently taught an informal two day class for another partner and for one of Cognos' ReportNet Product Managers. Additionally, he has close ties the person at Cognos who authored the SDK.

206.     The Cognos SDK and related materials, is highly material to most claims of the '863 patent, including but not limited to:

(a)     Independent claim 1, which includes the elements: "a content editor … to modify in a batch job the XML metadata content for each XML metadata content object of the selected group for storage of the modified XML metadata content in the metadata repository" and "a communication manager to issue instructions … for extraction of the XML metadata content for each XML metadata content object of the selected group from

the metadata repository and for the storage of the modified XML metadata content in the metadata repository."

(b) Independent claim 14, which includes the elements: "issue first instructions for extraction of the XML metadata content object of the selected group from the metadata repository" and "modify in a batch job the XML metadata content for each XML metadata content object of the selected group for storage of the modified XML metadata content in the metadata repository."

(c) Independent claim 23, which includes the elements: "extracting the XML metadata content for each XML metadata content object of the selected group from the metadata repository" and "wherein the extracting step includes issuing instructions through the application server along the communication path of the business intelligence system."

(d) Independent claim 23 and dependent claims 10, 21, 24, 25, 26, 27, and 29-38, all of which include one or more elements directed toward validation of XML metadata content objects.

207. A known use case for the Cognos SDK is the batch update of Cognos report specifications. Multiple instances of Cognos SDK training materials expressly reference this use case, including:

(a) A 2003 PowerPoint presentation titled Cognos SDK Advanced, which was in the possession of at least one named inventor of the '863 patent, includes a slide with the following language (in the body of the slide and in the notes section):

"The SDK allows clients to modify reports in a batch process enabling the ability to:
- Add graphics
- Change titles
- Add filters

Or anything Report Studio can do"

"There are many examples of clients who want to dynamically modify reports en mass, without the overhead of loading each one in Report Studio. Also, clients may want to create custom versions of reports, without saving the report specification back to the Content Store."

47

"Clients can schedule batch updates of reports to change titles, add new graphics, add filters, or anything Report Studio can do."

208.    The Cognos SDK training materials include multiple workshops.  Workshop #4 of the Cognos SDK training materials, which was in the possession of at least Danielewski, includes the following language:

"1.1  Business Case

There are many examples of clients who want to dynamically modify reports en mass, without the overhead of loading each one in Report Studio.  Also, clients may want to create custom versions of reports, without saving the report specification back to the Content Store.

Clients can schedule batch updates of reports to change titles, add new graphics, add filters, or anything Report Studio can do.

It is important to note that the report specification is an XML document and should be manipulated with a DOM.

This workshop uses the following SDK methods and classes:

> Modifying a report
>
> Execute report spec
>
> Modify spec
>
> Load spec into a DOM
>
> Change Header Titles
>
> Add a filter
>
> Add a column
>
> Add – Remove a column
>
> Change colors"

209.    Cognos makes available electronic training courses referred to as "Computer Based Training" or "CBT" and such training courses are highly material to patentability of the '863 patent.

48

210.    Rachmiel, Morgan, and Danielewski were aware of the various Cognos CBT's before and during prosecution of the '863 patent since BSP has offered for sale (and received customer requests regarding) Cognos CBT's on a variety of Cognos topics.

211.    One of the CBT's made available by Cognos is the "Cognos 8 Software Development Kit Self-Paced Training" Course (C88072), an electronic training course that contains, *inter alia*, interactive training videos, SDK training exercises, and example SDK solutions.

212.    The C88072 training includes an end-to-end workshop with the following language:

> "Retrieve the report specification for each report.
>
> Load each specification into an XML DOM.
>
> Modify the modelPath information in the specification for each report by changing it to use the latest modelPath. Use the /model[last()] function to find the last published model. If model versioning is not being used, you will change the modelPath to the generic syntax /model[@name='model']"
>
> "After you have clicked the Update Reports button, you will see that the report specifications have been modified to use the latest run time version of the model."

213.    Rachmiel, Morgan, and Danielewski had access to the C88072 training, yet failed to disclose the C88072 training to the USPTO until after a notice of allowance had already been received and Motio sent an excerpt of the study guide associated with the C88072 training to the attention of the law firm handling prosecution of the '863 patent.

214.    In a Second Supplemental Information Disclosure Statement (IDS) submitted to the USPTO on June 27, 2011, the law firm handling prosecution of the '863 patent disclosed certain excerpts of the C88072 training, but characterized these materials in an intentionally

misleading manner in an attempt to question whether such material constitutes a printed

publication under 35 U.S.C. § 102, including the following language:

> The other document provided by Motio appears to be an excerpted copy of a document entitled 'Self-Paced Training - Cognos 8 Software Development Kit' (referred to herein as 'the Training Document'). To the best knowledge of the applicants, the Training Document was only made available in connection with an on-line training course offered by Cognos, Incorporated (now part of IBM Corporation). The applicants are unaware of when the on-line training course was accessible to the public, but the second page of the Training Document refers to publication in November 2005.

> IBM appears to still offer on-line training courses, including a current course directed to the SDK for Cognos 8 ("IBM Cognos 8 SDK Self-Paced Training Package - eLearning"). Further information regarding the current course is provided via a copy of the "Course Description" website page, a copy of which is also submitted herewith. The current course website page includes a reference to "Batch update report specifications" in an end-to-end workshop, but the applicants are unaware of when the website page was first published, much less whether the earlier version of the website page would have included any such reference.

> The reference to publication in November 2005 notwithstanding, the applicants submit that insufficient factual evidence is present to establish that the Training Document qualifies as a printed publication under 35 U.S.C. § 102. To the best of the knowledge of the applicants, the Training Document would have been only available to those individuals who registered for the on-line course provided by Cognos Incorporated. To the best of the knowledge of the applicants, registration for the course required payment of a registration fee. The fee for the current course is $2,100.00 (see the above-referenced website page). Any further dissemination of the Training document would have been prohibited by the restrictions set forth on the second page, which declares that the document "contains proprietary information of Cognos Incorporation."

> The applicants submit that insufficient evidence is present to establish the date of publication of the Training Document. The reference to November 2005 publication does not identify when the Training Document was first received by a member of the public registering for the course. See MPEP §2128.02 (publication disseminated by mail is not prior art until received). The applicants are unaware of when individuals first registered for the on-line course, let alone attended the on-line course, or much less

50

downloaded or otherwise received the Training Document. The applicants are also unaware of when any reference to the availability of the on-line course was first posted on a website.

The applicants are also unaware of whether interested persons, exercising reasonable diligence, could have located the Training Document at that time. For instance, the applicants are unaware of whether an earlier version of the above-referenced website page made reference to the Training Document or other course materials. The applicants are also unaware of whether an earlier version of the above-referenced website page provided any information regarding the contents of any course materials.

For these reasons, the applicants submit that evidence is not present to establish a date that the Training Document was sufficiently accessible to qualify as a printed publication, or "prior art" to the present application.

215.     Danielewski, a named inventor of the '863 patent, who was aware of and had possession of the C88072 training (as well as the entire CBT) before the earliest filing date of the '863 patent, was never consulted regarding the C88072 training and/or the statements made in the Second Supplemental Information Disclosure Statement (IDS) submitted to the USPTO on June 27, 2011.

216.     The failure to consult with Danielewski was intentional.

217.     In fact, Danielewski testified that he disagrees with numerous statements made in the June 27, 2011 transmittal letter to the USPTO and would have so informed the other named inventors of the '863 patent and/or their attorneys if he had been asked.[1]

218.     Cognos makes available SDK Samples that are installed as part of the Cognos SDK installation, along with comprehensive documentation, and such SDK Samples are highly material to patentability of the '863 patent.

---

[1] Given this testimony, it appears that Rachmiel and Morgan intentionally excluded Danielewski from the process of prosecuting the '863 patent.

219. Rachmiel, Morgan, and/or Danielewski were aware of the various Cognos SDK Samples before and during prosecution of the '863 patent.

220. Numerous incarnations of the Cognos SDK Samples (e.g., those included with the Cognos ReportNet and Cognos 8 SDK installations) have examples in several programming languages that demonstrate how to utilize the Cognos SDK to query, execute, retrieve, copy, update, save, and manipulate objects in Cognos.

221. The 2004 release of Cognos ReportNet 1.1.MR2 SDK includes multiple samples that constitute prior art, including but not limited to:

> (a) A VB sample titled "reportSpec" (and also a similar Java sample). The description of this sample includes the following description:
>
>> "reportSpec.vbp - Modify a report in Cognos ReportNet
>>
>> The Visual Basic reportSpec sample program contains methods to retrieve a report, add a column, update the report specification and save the updated report back to Cognos ReportNet."
>
> (b) A Java example titled "Add Report", with a description that demonstrates how to add report specifications to the content store as well as programmatically validate the specification:
>
>> "The Java AddReportUI sample program creates a Report Object in the content store based on file you provide containing a valid xml report specification. …
>>
>> If you selected the 'Validate Specification' option, your report specification will be validated. Success or failure will be reported in the output pane. If you selected the 'Add Specification to the Content Store' option, the xml file will be validated, and, if successful, a new report will be created in the Content Store. You will be prompted to provide a name for the new report."

(c) Other SDK Samples material to patentability of the '863 patent include the VB sample "groupsandroles," the Java example "GroupsAndRolesGUI," and "ViewCMReports."

222. Moreover, the 2005 release of Cognos 8 SDK installation included multiple material examples:

(a) Report Upgrade, example excerpt from Java_ReportUpgrade_ Explain.html:

"Upgrades and/or Extracts Report Specifications from Report Objects in the Content Store.

The Java ReportUpgrade SDK sample program upgrades the Specification property of Report Objects in the Content Store to Cognos 8. It also allows report specifications to be extracted to the local file system, as they exist, or upgraded to Cognos 8."

223. One or more of named inventors of the '863 patent intentionally failed to disclose the above-described Cognos SDK materials to the USPTO during prosecution of the application that matured into the '863 patent.

#### (4) Failure to Disclose Cognos Documentation

224. As described above, Rachmiel, Morgan, and Danielewski were aware of the documentation that is included with a Cognos install, including but not limited to the Cognos Report Studio Guide. However, the Cognos Report Studio Guide was intentionally withheld from disclosure to the USPTO.

225. The Cognos Report Studio Guide (from 2004 and other versions) includes the following language:

"When you create a report in Cognos Report Studio, you are creating a report specification. A report specification is an XML file that you can view (Tools menu, Show Specification). Instead of using Cognos Report Studio, you can programmatically create or modify reports by using an editing tool to work with report specifications. You then use the ReportNet software development kit (SDK) to implement the reports in your ReportNet

environment. This is useful if, for example, you must make the same modification in many reports. Rather than opening each report in Cognos Report Studio and making the change, you can automate the process using the SDK, thereby saving you time. For more information, see the ReportNet Developer Guide."

226.     One or more of the named inventors of the '863 patent intentionally failed to disclose the existence of the Cognos Report Studio Guide and/or its content to the USPTO during prosecution of the application that matured into the '863 patent.

### (5)  Failure to Disclose Cognos SupportLink Article

227.     As described above, Rachmiel, Morgan, and Danielewski were aware of several articles published in the Cognos SupportLink magazine that are material to patentability of the '863 patent, as well as several software examples that were published on the accompanying support website.

228.     One highly material Cognos SupportLink article is entitled "Modifying a Report Specification Using the ReportNet SDK," by Cynthia Sleigh.  One of the named inventors of the '863 patent, Danielewski, actually produced a copy of this article in response to a third-party subpoena in this litigation and confirmed that such article has been in his possession well before the application for the '863 patent was filed.

229.     The Cynthia Sleigh SupportLink article is highly material to most claims of the '863 patent, including but not limited to:

   (a)     Independent claim 1, which includes the elements: "a content editor … to modify in a batch job the XML metadata content for each XML metadata content object of the selected group for storage of the modified XML metadata content in the metadata repository" and "a communication manager to issue instructions … for extraction of the XML metadata content for each XML metadata content object of the selected group from the metadata repository and for the storage of the modified XML metadata content in the metadata repository."

   (b)     Independent claim 14, which includes the elements: "issue first instructions for extraction of the XML metadata content object of the

54

selected group from the metadata repository" and "modify in a batch job the XML metadata content for each XML metadata content object of the selected group for storage of the modified XML metadata content in the metadata repository."

(c)    Independent claim 23, which includes the elements: "extracting the XML metadata content for each XML metadata content object of the selected group from the metadata repository" and "wherein the extracting step includes issuing instructions through the application server along the communication path of the business intelligence system."

230.    Notwithstanding that one of more of the named inventors of the '863 patent had knowledge and access to the Cynthia Sleigh SupportLink article, such SupportLink article was intentionally withheld from disclosure to the USPTO.

### (6) *Failure to Disclose US Patent Application Publication 2007/0174069*

231.    One or more of the named inventors of the '863 patent was aware of Motio's patent application publication 2007/0174069 (the '069 Publication).

232.    Rachmiel is a named inventor in both the '589 patent and the '863 patent, and the same law firm (Lempia Summerfield Katz LLC) handled prosecution of both the '589 patent and the '863 patent.

233.    Notably, the named inventors of the '589 patent Rachmiel and Weiss (and their law firm), disclosed to the USPTO the '069 Publication during prosecution of the '589 patent.

234.    Notwithstanding this clear knowledge of the '069 Publication, one or more of the named inventors of the '863 patent (and their law firm) intentionally failed to disclose to the USPTO the '069 Publication during prosecution of the '863 patent.

235.    The '069 Publication describes a method for automated testing and version control in a business intelligence environment. It describes the automatic validation of a report specification as an example pre-execution assertion. Example excerpts from the '069 Publication are provided below:

"Errors are detected and corrected continuously to reduce the time needed by report authors to locate and correct errors in report specifications, metadata models, analysis cubes, and other business intelligence artifacts

…

The assertions are used in the practice of the method to determine whether the business intelligence artifact is functioning properly. Examples of assertions are that the artifact is valid, … The assertions may be requirements of the report specification before it is run or executed, i.e., pre-execution assertions, and requirements of the report specification after it is executed, i.e., post-execution assertions.

…

In one embodiment the automated agent may test the business intelligence artifact against pre-execution assertions to determine whether the artifact is valid, then execute the artifact, and finally test the results or output of the execution of the artifact against post-execution assertions to verify the results. This step of testing the business intelligence artifact is repeated for every test case that is created by an author"

236. Approximately seventeen claims in the '863 patent contain elements pertaining to the validation of report specifications.

237. For example, claim 23 contains:

"… evaluating the XML metadata content stored in the metadata repository for each XML metadata content object of the selected group during implementation of the batch job for the selected group; and providing results of the evaluating step to indicate an extent to which the XML metadata content has been validated;"

238. One or more of the named inventors of the '863 patent were aware of the '069 Publication, it was cited it during prosecution of the '589 patent, but intentionally withheld from the USPTO during prosecution of the '863 patent.

### (7) Non-Cumulative, Materiality, and Intent to Deceive

239.    The above-described prior art materials were not cumulative of the information cited during prosecution of the application that matured into the '863 patent.  Indeed, the above-described prior art materials were considerably more material than any references cited during prosecution of the application that matured into the '863 patent.

240.    For example, in a Response to Office Action filed with the USPTO on April 4, 2011, Rachmiel, Morgan, and Danielewski distinguished the prior art references cited by the USPTO Examiner on the basis that the primary cited reference (Mamou) "does not teach the use of XML metadata content to define report specifications, but rather only generally refers to the production of reports 110 after the data integration processing is finished … As a result, Mamou does not address the selection, extraction, modification, or other processing of such report specification metadata, much less batch modification or processing of such metadata."

241.    As already discussed in detail, the above-described prior art materials relate directly to the use of XML metadata content to define report specifications, as well as the selection, extraction, and batch modification or other processing of such report specification metadata.

242.    After filing the application, neither Rachmiel, Morgan, nor the attorney(s) prosecuting the application that matured into the '863 patent ever consulted with or inquired of Danielewski's knowledge of potentially material prior art references.

243.    The named inventors of the '863 patent, in particular Rachmiel and Morgan, knew that issuance of the '863 patent was critical to BSP's ability to survive.

244.    Considering the "but for" materiality of one or more of the above-described prior art materials, the named inventors' awareness of such prior art materials, the failure to inquire of Danielewski's knowledge of material prior art references, and the named inventors' knowledge

that issuance of the '863 patent was critical to BSP's business, the single most reasonable inference to be drawn from the above-described actions or omissions is that one or more of the named inventors and/or the attorney(s) prosecuting the application that matured into the '863 patent intended to deceive the Examiner during prosecution of the application that matured into the '863 patent.

245.    Accordingly, the '863 patent is unenforceable because of inequitable conduct committed by one or more of the named inventors and/or one or more of the attorney(s) prosecuting the application that matured into the '863 patent.

## COUNTS

### COUNT I
#### DECLARATORY RELIEF REGARDING NON-INFRINGEMENT OF THE '589 PATENT

246.    Motio re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 245.

247.    Based at least in part on BSP's filing of this action and Motio's affirmative defenses, an actual controversy has arisen and now exists between the parties as to whether Motio infringes one or more claims of the '589 patent.

248.    Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, Motio requests a declaration by the Court that it does not infringe any claim of the '589 patent under any theory (including directly (whether individually or jointly) or indirectly (whether contributorily or by inducement)).

### COUNT II
#### DECLARATORY RELIEF REGARDING NON-INFRINGEMENT OF THE '863 PATENT

249.    Motio re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 248.

250.   Based at least in part on BSP's filing of this action and Motio's affirmative defenses, an actual controversy has arisen and now exists between the parties as to whether Motio infringes one or more claims of the '863 patent.

251.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., Motio requests a declaration by the Court that it does not infringe any claim of the '863 patent under any theory (including directly (whether individually or jointly) or indirectly (whether contributorily or by inducement)).

## COUNT III
### DECLARATORY RELIEF REGARDING INVALIDITY OF THE '589 PATENT

252.   Motio re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 251.

253.   Based at least in part on BSP's filing of this action and Motio's affirmative defenses, an actual controversy has arisen and now exists between the parties as to the validity of one or more claims of the '589 patent.

254.   Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and 35 U.S.C. § 100 *et seq*., Motio requests a declaration by the Court that one or more claims of the '589 patent are invalid.

## COUNT IV
### DECLARATORY RELIEF REGARDING INVALIDITY OF THE '863 PATENT

255.   Motio re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 254.

256.   Based at least in part on BSP's filing of this action and Motio's affirmative defenses, an actual controversy has arisen and now exists between the parties as to the validity of one or more claims of the '863 patent.

257.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and 35 U.S.C. § 100 *et seq*., Motio requests a declaration by the Court that one or more claims of the '863 patent are invalid.

## COUNT V
## DECLARATORY RELIEF REGARDING UNENFORCEABILITY OF THE '589 PATENT

258.     Motio re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 257.

259.     Based at least in part on BSP's filing of this action and Motio's affirmative defenses, an actual controversy has arisen and now exists between the parties as to whether the claims of the '589 patent are enforceable.

260.     Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*., and 35 U.S.C. § 100 *et seq*., Motio requests a declaration by the Court that the claims of the '589 patent are unenforceable.

261.     Pursuant to 37 C.F.R. § 1.56, applicants for U.S. patents and their representatives before the USPTO are subject to a duty of candor, good faith, and honesty in their prosecution of patent applications.

262.     As described with particularity in Paragraphs 16-146 above, BSP, Rachmiel, Weiss, and their representatives before the USPTO breached the duty of candor, good faith, and honesty owed, engaged in inequitable conduct, and engaged in affirmative egregious misconduct (*Therasense, Inc. v. Becton, Dickinson and Co.,* 649 F.3d 1276 (Fed. Cir. 2011)) by at least the following:

      (a)    Notwithstanding a clear and demonstrable knowledge and understanding of the Cognos and MotioCI product, selected pre-examination search terms intentionally designed to exclude relevant and material prior art;

      (b)    Despite a clear and demonstrable knowledge and understanding of the documentation included in a Cognos installation, intentionally and

> willfully failed to disclose (a) Cognos 8.3 "Administration and Security Guide"; (b) Cognos 8.3 "Report Studio, Professional Authoring User Guide"; (c) Cognos 8.3 "Framework Manager User Guide"; and (d) Cognos 8.3 "Query Studio User Guide" to the USPTO;

> (c)    Despite a clear and demonstrable knowledge and understanding of the Cognos Training and Presentation Materials, intentionally and willfully failed to disclose the same to the USPTO;

> (d)    Intentionally and knowingly made false and misleading sworn statements to the USPTO; and

> (e)    Intentionally and knowingly submitted fraudulently doctored chat logs to the USPTO.

263.    The above-described actions or omissions committed by Rachmiel and Weiss and/or the attorney(s) prosecuting the application that matured into the '589 patent were intended to deceive the Examiner during prosecution of the application that matured into the '589 patent.

264.    Additionally, the previous examples of misconduct evidence an overall pattern and practice of conduct specifically designed to deceive the USPTO.

265.    But for the misconduct described above, including the use of deceiving and incomplete pre-examination search terms, the failure to disclose material prior art, the improper designation of the "references deemed most closely related," and fraudulent submission of doctored chat log, BSP would not have procured the '589 patent. The misconduct and withheld prior art is, therefore, material.

266.    All claims of the '589 patent are unenforceable because individuals associated with the filing and prosecution of the '589 patent committed inequitable conduct and/or affirmative egregious misconduct during prosecution of the '589 patent, all with the intent to deceive the USPTO.

267.    Accordingly, the '589 patent is unenforceable because of the inequitable conduct and/or the affirmative egregious misconduct committed by one or more of the named inventors

and/or one or more of the attorney(s) prosecuting the application that matured into the '589 patent.

## COUNT VI
### DECLARATORY RELIEF REGARDING UNENFORCEABILITY OF THE '863 PATENT

268. Motio re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 267.

269. Based at least in part on BSP's filing of this action and Motio's affirmative defenses, an actual controversy has arisen and now exists between the parties as to whether the claims of the '863 patent are enforceable.

270. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.*, and 35 U.S.C. § 100 *et seq.*, Motio requests a declaration by the Court that the claims of the '863 patent are unenforceable.

271. Pursuant to 37 C.F.R. § 1.56, applicants for U.S. patents and their representatives before the USPTO are subject to a duty of candor, good faith, and honesty in their prosecution of patent applications.

272. As described in detail above, one or more of the named inventors and their representatives before the USPTO breached the duty of candor, good faith, and honesty owed, engaged in inequitable conduct, and engaged in affirmative egregious conduct (*Therasense, Inc. v. Becton, Dickinson and Co.,* 649 F.3d 1276 (Fed. Cir. 2011)) by at least the following:

    (a)    Despite a clear and demonstrable knowledge and understanding of the ReportCentral Product Family, intentionally and willfully failed to disclose the same to the USPTO;

    (b)    Notwithstanding a clear and demonstrable knowledge and understanding of the MyPages Product Family and/or Cognos' development/ownership of the MyPages Product Family, intentionally and willfully failed to disclose the same to the USPTO;

(c)     Despite a clear and demonstrable knowledge and understanding of the materials relating to Cognos SDK, intentionally and willfully failed to disclose the same to the USPTO;

(d)     Despite a clear and demonstrable knowledge and understanding of the documentation included in a Cognos installation, intentionally and willfully failed to disclose the same to the USPTO;

(e)     Notwithstanding a clear and demonstrable knowledge and understanding of the Cognos SupportLink Article, intentionally and willfully failed to disclose the same to the USPTO; and

(f)     Despite a clear and demonstrable knowledge and understanding of the '069 Publication, intentionally and willfully failed to disclose the same to the USPTO.

273.   The above-described actions or omissions committed by Rachmiel, Morgan, Danielewski and/or the attorney(s) prosecuting the application that matured into the '863 patent were intended to deceive the Examiner during prosecution of the application that matured into the '863 patent.

274.   Additionally, the previous examples of misconduct evidence an overall pattern and practice of conduct specifically designed to deceive the USPTO.

275.   But for the misconduct described above, including the multiple failures to disclose material prior art, BSP would not have procured the '863 patent.  The misconduct and withheld prior art is, therefore, material.

276.   All claims of the '863 patent are unenforceable because individuals associated with the filing and prosecution of the '863 patent committed inequitable conduct and/or affirmative egregious misconduct during prosecution of the '863 patent, all with the intent to deceive the USPTO.

277.   Accordingly, the '863 patent is unenforceable because of the inequitable conduct and/or the affirmative egregious misconduct committed by one or more of the named inventors

and/or one or more of the attorney(s) prosecuting the application that matured into the '863 patent.

## COUNT VII
### SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### (*WALKER PROCESS* FRAUD)

278.    Motio re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 277.

279.    As set forth with particularity in Paragraphs 16-146 above, BSP and its agents, Rachmiel and Weiss, procured the '589 patent through intentional and fraudulent conduct on the USPTO, including through the use of knowingly deceptive, incomplete search terms, incomplete disclosures to the USPTO, false and misleading statements to the USPTO, and fraudulently doctored chat logs submitted to the USPTO, for the express purpose of securing a patent.

280.    In justifiable reliance on the fraudulent conduct, the USPTO issued the '589 patent.  But for the fraudulent conduct on the USPTO, the USPTO would not have issued the '589 patent.

281.    As set forth with particularity in Paragraphs 16-146 above, BSP and its agents, Rachmiel and Weiss, were aware of the fraudulent conduct in procuring the '589 patent both at the time that '589 patent was issued by the USPTO and at the time that it initiated this sham litigation against Motio.  BSP, therefore, is and was aware that the '589 patent is invalid and unenforceable.

282.    BSP and its agents, Rachmiel and Weiss, engaged in the fraudulent conduct in procuring the '589 patent with a specific intent to monopolize the relevant market and to drive its primary competitor, Motio, out of the market. In persisting in pursuing this litigation, Avnet is complicit in the effort to monopolize the market and drive Motio out of business.

283.    In furtherance of the plan and attempt to monopolize the product markets, and with a specific intent to monopolize the product markets, BSP undertook the following unlawful actions designed to defeat competition in violation of 15 U.S.C. § 2:

(a)    Obtained the '589 patent through knowing and willful fraud on the USPTO.  As detailed above, BSP and its agents knowingly and willfully selected pre-examination search terms intentionally designed to exclude relevant and material prior art, made false and misleading sworn statements to the USPTO, omitted material information from the USPTO, and fraudulently fabricated chat logs submitted to the USPTO;

(b)    Threatened and continue to threaten claims based on the '589 patent obtained through knowing and willful fraud on the USPTO;

(c)    Asserted and continue to assert the '589 patent in litigation, notwithstanding that such patent is invalid and unenforceable;

(d)    Filed and continue to prosecute this lawsuit, which is a sham, objectively baseless, and subjectively motivated to monopolize the relevant markets by driving Motio out of the marketplace and/or deterring customers from purchasing competitive products.

284.    In terms of the product markets, an industry has grown around supporting and optimizing IBM's Cognos Business Intelligence software.  The industry does not make the Cognos software.  Instead, it aims to improve the Cognos software.

285.    Two separate and distinct product markets have emerged within this industry. The **first** product market is comprised of products that offer version control features for IBM's Cognos Business Intelligence software.  The **second** product market is comprised of products that offer administrative tools for IBM's Cognos Business Intelligence software.

286.    BSP and Motio are the primary competitors in each of these two distinct product markets.

287.    The geographic scope of these product markets is the United States.

288.    In terms of the first product market (version control), Motio's flagship product is MotioCI, which offers complete version control.  BSP's primary product, Integrated Control Suite ("ICS"), also offers version control and directly competes with MotioCI.

289.    Motio's MotioCI product and BSP's ICS product are sold throughout the United States.

290.    Motio's MotioCI product and BSP's ICS product account for approximately 95% of the revenues in the version control product market, with the only substitutes for MotioCI and ICS being Envisn's Netvisn and Locus Solutions' Lifecycle management for Cognos.  These two substitutes only account for approximately 5% of the revenues in the version control product market.

291.    Motio has bid against Envisn in the version control product market only once in the past three years and never bid against Locus Solutions in the version control product market.

292.    Motio competes near exclusively against BSP in the version control product market and Motio's competition with BSP has a direct impact on the price of the software sold in the version control product market.

293.    In terms of the second product market (administrative tools), Motio's MotioPI product directly competes with BSP's MetaManager product.  Each of these products allows Cognos administrators to perform tasks within Cognos that are traditionally tedious and error prone.

294.    Motio offers both a MotioPI product and a MotioPI Pro product.  The MotioPI Pro product is free, which is part of Motio's sales strategy because users often upgrade from MotioPI to MotioPI Pro.  MotioPI Pro is an upgraded version of MotioPI and must be purchased by users.

295.     Motio's MotioPI products and BSP's MetaManager product are sold throughout the United States.

296.     Motio's MotioPI products and BSP's MetaManager product account for approximately 95% of the revenues in the administrative tools product market, with the only other product that performs similar functions being IBM's DRU product. IBM's DRU product, which only performs mass search and replace on reports, is a free product and only accounts for a small portion of the product market.

297.     Motio and BSP have an overwhelming share (approximately 95%) of both the version control product market and the administrative tools product market.

298.     Accordingly, should Motio be driven out of the version control product market and/or the administrative tools product market, there is a dangerous probability that BSP will achieve monopoly power in both the version control product market and the administrative tools product market in violation of 15 U.S.C. § 2.

299.     As a result of BSP's unlawful and fraudulent acts, in pursuing this sham litigation, and in touting its fraudulently obtained '589 patent in the marketplace, Motio has suffered and will continue to suffer antitrust injury in an amount to be proven at trial. Among other damages, Motio has lost sales, and incurred fees and costs in defending bad faith allegations of patent infringement.

300.     BSP's unlawful and exclusionary conduct has affected a substantial amount of interstate commerce in the United States.

301.     Competition and consumers in relevant markets have been injured. Among other injuries, BSP has restricted output in the relevant markets, restricted competition in the relevant markets by touting a fraudulently obtained patent, and raised the cost of entry into the relevant

markets by requiring would-be entrants to incur the cost of challenging the invalid and unenforceable '589 patent.

## COUNT VIII
### SECTION 2 OF THE SHERMAN ACT, 15 U.S.C. § 2
### (SHAM LITIGATION, ATTEMPTED MONOPOLIZATION)

302.  Motio re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 301.

303.  As set forth with particularity in Paragraphs 16-146 above, BSP and its agents, Rachmiel and Weiss, procured the '589 patent through intentional and fraudulent conduct on the USPTO, including through the use of deceptive and incomplete search terms and disclosures to the USPTO, false and misleading statements to the USPTO, and fraudulently doctored chat logs submitted to the USPTO.

304.  In justifiable reliance on the fraudulent conduct, the USPTO issued the '589 patent.  But for the fraudulent conduct on the USPTO, the USPTO would not have issued the '589 patent.

305.  As set forth with particularity in Paragraphs 16-146 above, BSP and its agents, Rachmiel and Weiss, were aware of the fraudulent conduct in procuring the '589 patent both at the time that '589 patent was issued by the USPTO and at the time that it initiated this sham litigation against Motio.  BSP, therefore, is and was aware that the '589 patent is invalid and unenforceable.

306.  Given the fraudulent conduct with regard to the USPTO, BSP's lawsuit against Motio seeking to enforce the '589 patent was objectively baseless.  No reasonable litigant could conclude that BSP's infringement allegations were reasonably calculated to elicit a favorable outcome based on the fraudulent and inequitable conduct in obtaining the '589 patent.

307.    BSP did not have probable cause to assert the '589 patent in this lawsuit because the '589 patent is invalid and unenforceable.

308.    BSP's lawsuit was also subjectively baseless.  BSP and its agents, Rachmiel and Weiss, were aware of its fraudulent conduct in procuring the '589 patent and were and are aware that the '589 patent is invalid and unenforceable.

309.    Aware that the '589 patent was and is invalid and unenforceable, BSP's sham lawsuit seeking to enforce the patent was motivated by a desire to impose anti-competitive injury on Motio by pushing it out of the version control product market and/or the administrative tools product market, rather than by a justifiable legal remedy.  In persisting in pursuing this litigation, Avnet is complicit in the effort to monopolize the market and drive Motio out of business, rather than seeking a justifiable legal remedy.

310.    By prosecuting and asserting the '589 patent in bad faith and through fraud and inequitable conduct on the USPTO, BSP seeks to raise the cost of doing business, drive Motio out of the marketplace, and deter customers from purchasing competitive products.

311.    As result of BSP's unlawful and fraudulent acts, in pursuing this sham litigation, and in touting its fraudulently obtained '589 patent in the marketplace, Motio has suffered and will continue to suffer antitrust injury in an amount to be proven at trial.  Among other damages, Motio has lost sales, and incurred fees and costs in defending bad faith allegations of patent infringement.

312.    BSP's unlawful and exclusionary conduct has affected a substantial amount of interstate commerce in the United States.

313.    Competition and consumers in relevant markets have been injured.  Among other injuries, BSP has restricted output in the relevant markets, restricted competition in the relevant

markets by touting a fraudulently obtained patent, and raised the cost of entry into the relevant markets by requiring would be entrants to incur the cost of challenging the invalid and unenforceable '589 patent.

## COUNT IX
### SECTION 1 OF THE SHERMAN ACT, 15 U.S.C. § 1
#### (CONSPIRACY IN RESTRAINT IN TRADE)

314.    Motio re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 313.

315.    In November 2012, Avnet completed the purchase of Plaintiff BSP.

316.    As part of the purchase, Avnet obtained ownership of the patents-in-suit and all rights associated with such patents.

317.    Upon information and belief, prior to the closing of the purchase in November 2012, BSP represented to Avnet that if successful in the above-captioned lawsuit, Avnet would obtain a monopoly in the marketplace for products that offer version control features for IBM's Cognos Business Intelligence software and in the marketplace for products that offer administrative tools for IBM's Cognos Business Intelligence software.

318.    Avnet's acquisition of BSP to achieve a monopoly in the relevant product markets is a contract, combination, and/or conspiracy in restraint of trade in violation of Section 1 of the Sherman Act.

319.    Avnet's purchase agreement with BSP is a contract through which Avnet obtained the fraudulently obtained rights in the '589 patent and the rights to this sham litigation.

320.    Likewise, the acquisition of BSP by Avnet is a combination and/or conspiracy designed to monopolize the relevant markets.

321.    The contract, combination, and/or conspiracy between BSP and Avnet has had an anticompetitive effect in the relevant markets resulting from the actions of BSP and Avnet.  Such actions resulting in the anticompetitive effect include:

(a)    BSP and its agent acquired the '589 patent through fraud on the USPTO;

(b)    Avnet acquired BSP with the specific intent to monopolize the relevant markets and to drive Motio out of the marketplace;

(c)    Since acquiring BSP, Avnet continues to pursue this sham litigation, despite knowledge of the fraudulent misconduct, invalidity, and unenforceability of the '589 patent;

(d)    Since acquiring BSP, Avnet has touted the invalid and unenforceable '589 patent in the marketplace in an attempt to drive Motio out of the marketplace; and

(e)    Since acquiring BSP, Avnet has prosecuted this lawsuit, which is a sham, objectively baseless, and subjectively motivated to monopolize the relevant markets by driving Motio out of the marketplace and/or deterring customers from purchasing competitive products.

322.    The contract, combination, and/or conspiracy between BSP and Avnet has had an anticompetitive effect in the relevant markets, including raising the cost of doing business, working to drive Motio out of the marketplace, deterring customers from purchasing competitive products, and raising the cost of entry into the relevant markets by requiring would-be entrants to incur the cost of challenging the invalid and unenforceable '589 patent.

323.    As a result of the contract, combination, and/or conspiracy between BSP and Avnet, Motio has suffered and will continue to suffer antitrust injury in an amount to be proven at trial.  Among other damages, Motio has lost sales, and incurred fees and costs in defending bad faith allegations of patent infringement.

324.    The contract, combination, and/or conspiracy between BSP and Avnet has further caused injury to the relevant markets.

325.     Among other injuries, the contract, combination, and/or conspiracy between BSP and Avnet has restricted output in the relevant markets, restricted competition in the relevant markets by touting a fraudulently obtained patent, and raised the cost of entry into the relevant markets by requiring would be entrants to incur the cost of challenging the invalid and unenforceable '589 patent.

## COUNT X
### EXCEPTIONAL CASE

326.     Motio re-alleges and incorporates by reference the allegations set forth in paragraphs 1 through 325.

327.     This case is an exceptional case pursuant to 35 U.S.C. § 285, and therefore Motio is entitled to an award of attorneys' fees and costs.

## PRAYER FOR JUDGMENT

WHEREFORE, Motio respectfully requests a judgment against BSP as follows:

A.     A declaration that Motio does not infringe, under any theory, any valid claim of the '589 patent and/or the '863 patent that may be enforceable;

B.     A declaration that all claims of the '589 patent and the '863 patent are invalid;

C.     A declaration that all claims of the '589 patent and the '863 patent are unenforceable due to inequitable conduct during the prosecution thereof;

D.     Judgment that BSP has violated Section 2 of the Sherman Act under *Walker Process*;

E.     Judgment that BSP has violated Section 2 of the Sherman Act under Sham Litigation;

F.     Judgment that BSP has violated Section 1 of the Sherman Act;

G.     A declaration that BSP take nothing by its Complaint;

H.     Judgment against BSP and in favor of Motio;

I.     Judgment finding this case exceptional under 35 U.S.C. § 285;

J.    Judgment finding that BSP violated Section 2 of the Sherman Act, 15 U.S.C. § 2, and awarding treble damages and attorneys' fees and costs;

K.    Judgment finding that BSP violated Section 1 of the Sherman Act, 15 U.S.C. § 1, and awarding treble damages and attorneys' fees and costs;

L.    Judgment awarding Motio its costs and attorneys' fees in connection with this action;

M.    A permanent injunction enjoining BSP and its affiliates, subsidiaries, officers, directors, employees, agents, representatives, licensees, successors, assigns, and all those acting for any of them or on their behalf, or acting in concert with them, from monopolizing or attempting to monopolize the relevant product and geographic markets, as provided by 15 U.S.C. § 26;

N.    Dismissal of the Complaint with prejudice; and

O.    Further relief as the Court may deem just and proper.

## JURY DEMAND

Motio hereby demands trial by jury on all issues.

Dated: October 2, 2014                    Respectfully Submitted,

/s/ Jeffrey M. Drake

Dean A. Dickie
Jeffrey M. Drake
MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.
225 West Washington Street, Suite 2600
Chicago, Illinois 60606
Telephone: (312) 460-4200
Facsimile: (312) 460-4288
dickie@millercanfield.com
drakej@millercanfield.com

Kelly J. Kubasta
KLEMCHUK KUBASTA LLP
8150 North Central Expressway, 10th Floor
Dallas, Texas 75206
Telephone: (214) 367-6000
Facsimile: (214) 367-6001
kelly.kubasta@kk-llp.com

*Counsel for Defendant/Counter-Plaintiff*

# Exhibit A

| | |
|---|---|
| **From:** | Andrew Weiss |
| **Sent:** | Wednesday, December 29, 2010 1:24 PM |
| **To:** | Andy Rachmiel |
| **Subject:** | Chat regarding Version Control |
| **Attachments:** | MessageLog.xsl; agrachmiel3381221809.xml; agrachmiel3381221809.pdf |

I found this chat log which mentioned briefly that we were discussing version control and were actively brainstorming ideas of how to be more integrated than our competitors.
The xml file is the chat log from windows live messenger, with some old chat sessions removed for clarity. The PDF is a hardcopy.

Let me know if this is enough or if you want me to keep digging.

-andy

---

**Andrew Weiss - BSP Software, LLC | www.bspsoftware.com**
1701 W. Golf Road | Suite 3-604 | Rolling Meadows, IL 60008
http://www.youtube.com/user/BSPSoftware



EXHIBIT
_Weiss_
_32_
6/27/13

1

HIGHLY CONFIDENTIAL

BSP00226579

```xml
<?xml version="1.0" ?>
- <xsl:stylesheet version="1.0" xmlns:xsl="http://www.w3.org/1999/XSL/Transform">
    <!-- localized strings -->
    <xsl:variable name="ColumnHeader_Date">Date</xsl:variable>
    <xsl:variable name="ColumnHeader_Time">Time</xsl:variable>
    <xsl:variable name="ColumnHeader_From">From</xsl:variable>
    <xsl:variable name="ColumnHeader_To">To</xsl:variable>
    <xsl:variable name="ColumnHeader_Message">Message</xsl:variable>
    <!-- variables -->
    <xsl:variable name="Debug">0</xsl:variable>
    <xsl:variable name="TableStyle">font-family:MS Shell Dlg 2; font-size:67%; text-
      align:left; vertical-align:top; table-layout:fixed</xsl:variable>
    <xsl:variable name="GutterStyle">width:2ex</xsl:variable>
    <xsl:variable name="HeaderStyle">border-bottom:1 solid black</xsl:variable>
    <xsl:variable name="UseZebraStripe">1</xsl:variable>
    <xsl:variable name="ZebraStripeStyle">background-color:#e0edff</xsl:variable>
    <xsl:variable name="MostRecentSessionFirst">0</xsl:variable>
  - <xsl:template match="Log">
    - <html dir="ltr">
      - <head>
        - <title>
            Message Log for
            <xsl:value-of select="@LogonName" />
            <xsl:if test="$Debug = 1">(Debug)</xsl:if>
          </title>
        - <xsl:if test="$Debug = 1">
            <span style="font-family:trebuchet ms; font-size:120%">Debug
              Version</span>
            <hr />
          </xsl:if>
        </head>
      - <body style="margin:0">
        - <table id="BodyTable" style="{$TableStyle}" cellspacing="0">
          - <xsl:if test="$Debug = 1">
              <col style="vertical-align:top; width:5ex;" />
              <col style="{$GutterStyle}" />
            </xsl:if>
            <col style="width:16ex;" />
            <col style="{$GutterStyle}" />
            <col style="width:16ex;" />
            <col style="{$GutterStyle}" />
            <col style="width:21ex;" />
            <col style="{$GutterStyle}" />
            <col style="width:21ex;" />
            <col style="{$GutterStyle}" />
            <col style="width:70ex;" />
          - <thead>
            - <tr>
              - <xsl:if test="$Debug = 1">
                  <th style="{$HeaderStyle}">SID</th>
                  <th />
                </xsl:if>
              - <th style="{$HeaderStyle}">
                  <xsl:value-of select="$ColumnHeader_Date" />
                </th>
```

BSP00226580

```xml
        <th />
      – <th style="{$HeaderStyle}">
          <xsl:value-of select="$ColumnHeader_Time" />
        </th>
        <th />
      – <th style="{$HeaderStyle}">
          <xsl:value-of select="$ColumnHeader_From" />
        </th>
        <th />
      – <th style="{$HeaderStyle}">
          <xsl:value-of select="$ColumnHeader_To" />
        </th>
        <th />
      – <th style="{$HeaderStyle}">
          <xsl:value-of select="$ColumnHeader_Message" />
        </th>
      </tr>
    </thead>
  – <tbody style="vertical-align:top">
    – <xsl:choose>
        <!-- newest session first   -->
      – <xsl:when test="$MostRecentSessionFirst = 1">
        – <xsl:apply-templates>
            <xsl:sort select="@SessionID" order="descending" data-
              type="number" />
            <xsl:sort select="@DateTime" order="ascending" />
          </xsl:apply-templates>
        </xsl:when>
        <!-- oldest session first   -->
      – <xsl:otherwise>
        – <xsl:apply-templates>
            <xsl:sort select="@SessionID" order="ascending" data-
              type="number" />
            <xsl:sort select="@DateTime" order="ascending" />
          </xsl:apply-templates>
        </xsl:otherwise>
      </xsl:choose>
    </tbody>
  </table>
 </body>
</html>
</xsl:template>
– <xsl:template match="Message">
 – <tr>
     <xsl:call-template name="CommonMessageProcessing" />
   – <td>
       <xsl:apply-templates select="From/User" />
     </td>
     <td />
   – <td>
       <xsl:apply-templates select="To/User" />
     </td>
     <td />
   – <td>
     – <span>
```

```xml
            - <xsl:attribute name="style">
                 <xsl:value-of select="Text/@Style" />
              </xsl:attribute>
              <xsl:value-of select="Text" />
           </span>
        </td>
     </tr>
  </xsl:template>
- <xsl:template match="Invitation|InvitationResponse|Join|Leave">
   - <tr>
        <xsl:call-template name="CommonMessageProcessing" />
        <td />
        <!-- From   -->
        <td />
        <td />
        <!-- To   -->
        <td />
      - <td>
         - <span>
            - <xsl:attribute name="style">
                 <xsl:value-of select="Text/@Style" />
              </xsl:attribute>
              <xsl:value-of select="Text" />
           </span>
        </td>
     </tr>
  </xsl:template>
- <xsl:template match="User">
     <!--  add a comma before all but the first user   -->
     <xsl:if test="position() != 1">,</xsl:if>
     <xsl:value-of select="@FriendlyName" />
  </xsl:template>
- <xsl:template name="CommonMessageProcessing">
     <!--  zebra-stripe the sessions   -->
   - <xsl:if test="$UseZebraStripe = 1">
      - <xsl:if test="(@SessionID mod 2) = 1">
         - <xsl:attribute name="style">
              <xsl:value-of select="$ZebraStripeStyle" />
           </xsl:attribute>
        </xsl:if>
     </xsl:if>
   - <xsl:if test="$Debug = 1">
      - <td>
           <xsl:value-of select="@SessionID" />
        </td>
        <td />
     </xsl:if>
   - <td>
        <xsl:value-of select="@Date" />
     </td>
     <td />
   - <td>
        <xsl:value-of select="@Time" />
     </td>
     <td />
```

BSP00226582

```
    </xsl:template>
</xsl:stylesheet>
```

HIGHLY CONFIDENTIAL

# Message History (MSN)

| DateTime | From | To | Message |
|---|---|---|---|
| 2/14/2008 10:46:04 AM | Andy | Andrew | any of these near you? |
| 2/14/2008 10:46:04 AM | Andy | Andrew | http://offices.regus.com/search/results.htm?lnk=FND-SEA-BUT&grp=OFF |
| 2/14/2008 10:46:57 AM | Andrew | Andy | session timed out. what were you searching, virtual offices? |
| 2/14/2008 10:47:13 AM | Andy | Andrew | yip. go to www.regus.com |
| 2/14/2008 10:48:05 AM | Andrew | Andy | you know I just spent a week building a room... stud walls, sheetrock, spackle, paint, electric, the works... |
| 2/14/2008 10:48:15 AM | Andrew | Andy | I'll send you pictures in a few. |
| 2/14/2008 10:49:19 AM | Andy | Andrew | so you don't need an offiste location, correct? |
| 2/14/2008 10:49:56 AM | Andrew | Andy | not unless you start hiring more developers in NJ and I get to be the Michael Scott of the Hazlet branch! |
| 2/14/2008 10:50:18 AM | Andrew | Andy | Or if wee need to rent a meeting room for some reason |
| 2/14/2008 10:51:01 AM | Andy | Andrew | :D |
| 2/14/2008 10:51:02 AM | Andy | Andrew | k |
| 2/14/2008 10:51:05 AM | Andy | Andrew | nevermind |
| 2/14/2008 10:51:29 AM | Andrew | Andy | But this is good to know about. New Jersey, Red Bank - Red Bank (HQ) |
| 2/14/2008 10:51:45 AM | Andrew | Andy | This one is the closest, I actually looked at it on a weekend, nobody was around. |
| 2/14/2008 10:53:54 AM | Andrew | Andy | you only get to work in it for 40 hours a month! These people don't work do they... |
| 2/14/2008 1:54:44 PM | Andrew | Andy | It's going to be funny when Godfrey see my name on that CC list. :) |
| 2/14/2008 1:55:39 PM | Andrew | Andy | Are you busy? I'm putting together an email for you, but it would be easier to chat if you have a few. |
| 2/14/2008 1:55:39 PM | Andy | Andrew | huh? |
| 2/14/2008 1:56:04 PM | Andy | Andrew | oh. yeah. Did you look at the motio ci website that I was talking about yesterday |
| 2/14/2008 1:57:19 | Andrew | Andy | Yes, their approach seems very technical and admin |

BSP00226584

| | | | |
|---|---|---|---|
| PM | | | savvy. If we're going to be competitive we need to target the end users and make it look/feel like Cognos. |
| 2/14/2008 1:59:14 PM | Andy | Andrew | Agreed. i'm jumping onto a conf call... demo time |
| 2/14/2008 1:59:55 PM | Andrew | Andy | ok. I'll send you the email. we'll talk later, I have a few ideas... |

HIGHLY CONFIDENTIAL

BSP00226585

| Date | Time | From | To | Message |
|------|------|------|-----|---------|
| 2/14/2008 | 10:46:04 AM | Andy | Andrew | any of these near you? |
| 2/14/2008 | 10:46:04 AM | Andy | Andrew | http://offices.regus.com/search/results.htm?lnk=FND-SEA-BUT&grp=OFF |
| 2/14/2008 | 10:46:57 AM | Andrew | Andy | session timed out. what were you searching, virtual offices? |
| 2/14/2008 | 10:47:13 AM | Andy | Andrew | yip. go to www.regus.com |
| 2/14/2008 | 10:48:05 AM | Andrew | Andy | you know I just spent a week building a room... stud walls, sheetrock, spackle, paint, electric, the works... |
| 2/14/2008 | 10:48:15 AM | Andrew | Andy | I'll send you pictures in a few. |
| 2/14/2008 | 10:49:19 AM | Andy | Andrew | so you don't need an offiste location, correct? |
| 2/14/2008 | 10:49:56 AM | Andrew | Andy | not unless you start hiring more developers in NJ and I get to be the Michael Scott of the Hazlet branch! |
| 2/14/2008 | 10:50:18 AM | Andrew | Andy | Or if wee need to rent a meeting room for some reason |
| 2/14/2008 | 10:51:01 AM | Andy | Andrew | :D |
| 2/14/2008 | 10:51:02 AM | Andy | Andrew | k |
| 2/14/2008 | 10:51:05 AM | Andy | Andrew | nevermind |
| 2/14/2008 | 10:51:29 AM | Andrew | Andy | But this is good to know about. New Jersey, Red Bank - Red Bank (HQ) |
| 2/14/2008 | 10:51:45 AM | Andrew | Andy | This one is the closest, I actually looked at it on a weekend, nobody was around. |
| 2/14/2008 | 10:53:54 AM | Andrew | Andy | you only get to work in it for 40 hours a month! These people don't work do they... |
| 2/14/2008 | 1:54:44 PM | Andrew | Andy | It's going to be funny when Godfrey see my name on that CC list. :) |
| 2/14/2008 | 1:55:39 PM | Andrew | Andy | Are you busy? I'm putting together an email for you, but it would be easier to chat if you have a few. |
| 2/14/2008 | 1:55:39 PM | Andy | Andrew | huh? |
| 2/14/2008 | 1:56:04 PM | Andy | Andrew | oh. yeah. Did you look at the motio cl website that I was talking about yesterday |
| 2/14/2008 | 1:57:19 PM | Andrew | Andy | Yes, their approach seems very technical and admin savvy. If we're going to be competitive we need to target the end users and make it look/feel like Cognos. |
| 2/14/2008 | 1:59:14 PM | Andy | Andrew | Agreed. I'm jumping onto a conf call... demo time |
| 2/14/2008 | 1:59:55 PM | Andrew | Andy | ok. I'll send you the email. we'll talk later, I have a few ideas... |

HIGHLY CONFIDENTIAL

BSP00226586

| From: | John Porter [john.porter@wowway.com] |
|---|---|
| Sent: | Thursday, December 30, 2010 2:03 PM |
| To: | aweiss@teamtechsystems.com |
| Subject: | revised |

2/20/2008

AGR: I see you made it back.
ADW: Just got back and wanted to make sure VPN was working from the NJ office ;)
AGR: I'm glad you and Munson hit it off. He's really bright
ADW: I like Dave. We'll work well together
AGR: So this morning we had a demo where the company asked us about all the changes tht we make and how we record them.
ADW: Do you mean how they are logged
AGR: when we change something and make a mistake
AGR: No, not logging. capturning the changes so we can recover. I showed them the Transaction Mgr that details the changes and lets you revert
ADW: exactly
AGR: BRB

AGR: that will definitely work (trans mgr), but that only captures changes made with MM. we were talking about versioning reports that authors make.
ADW: does cognos have versioning in their products
AGR: no. you can version the FM files pretty easily. The problem is that reports aren't files. theyre stored in the content store.
ADW: we could make a module in metamanagr but then only metamanager users could recover versions. it has to be available to all users, or at least more than just developers
AGR: how do we do that
ADW: There has to be a way of putting version control into Cognos connection
AGR: I know you can customize themes and colors. Darek played with adding a link and icon when we did that portal tab distribution utility he wrote. we added an icon to the top of cognos connection with a link to a page we created that manages portal pages. pretty cool actually!
ADW: back in a minute. sarah needs something
AGR: take your time

ADW: lets put it on the list for our roadmap meeting Friday.
AGR: we should look at the utility darek built to see how he did it
ADW: yeah. let me look at the code.
AGR: awesome. MM is starting to sell. looks like our product group is taking off!!!
ADW: ;) have a good night
AGR: you too!

1

EXHIBIT
WEISS
34
6/27/13

HIGHLY CONFIDENTIAL

BSP00582882

# Exhibit B



## DID THEY REALLY THINK YOU WOULDN'T READ BETWEEN THE LINES?

Look At What Our Competitors Forgot To Mention

As you evaluate options for administering, maintaining and supporting your IBM Cognos environment, please consider the following features UNIQUE to MetaManager.

## FEATURES

- ✓ Patented innovation
- ✓ A simple and natural user experience
- ✓ Search the entire content store using over a dozen common pre-defined queries or easily build your own with MetaManager's query builder
  - Locate all broken reports
  - Identify content built from any package
- ✓ Easy exploration with MetaManager's portal tree
  - Copy, paste and rename content
  - Validate datasources
  - Export and import information
  - Over 50 context menu actions
- ✓ Incredibly simple command line automation
- ✓ Connect to any IBM Cognos version with the same single install of MetaManager
- ✓ Support, Support, Support!
  - Email, telephone and live chat support
  - Over 100 hours of recorded training and podcast content
  - Public searchable knowledgebase
- ✓ Scalable for optimal performance
- ✓ Seven years of proven success within IBM's largest customers

## UPDATE

- ✓ Content validation
  - Validate content and easily document the results
  - Fix reports issues with the click of a button
- ✓ Search and replace
  - Preview modifications before applying to ensure accuracy
  - Seamless integration with model changes to automate resolving all impacted content
  - Search and replace specific areas of content or within the entire report specification
  - Easily associate any report with any package
  - Document modifications before and after applying for detailed record keeping
- ✓ Editors
  - View, edit, validate and preview specifications
  - Modify any object property en masse (email, owner, default output, etc.)
  - Add, delete and modify prompt values
  - Obtain license useage statistics

## Customer Success has always been top priority for BSP Software!

## HOW WE STACK UP

| | Competition | BSP Software, an Avnet Company |
|---|---|---|
| Annual Sales | $2 Million | $26 Billion |
| Employee Headcount | 25 | 17,600 |
| Years Since Competitive Product Launch | 3 | 7 |

Company information obtained on February 1, 2013 from Hoovers.com and Dun & Bradstreet.



## MAKING THE SEEMINGLY IMPOSSIBLE ... SIMPLE!

**Try MetaManager Now**

### BLAST

- Blast portal tabs to users, groups and roles
- Set portal tabs as user home pages
- Hide and reorder portal tabs with ease (including public folders and My Folder tabs)
- Standardize report look and feel
- Modify datasource connection passwords

### EXTEND

- Advanced Framework Manager modeling
- Resolve broken PowerCube connections
- Create and maintain PowerCube datasource connections through file system locations
- Security migration self-service in 3 simple steps

### DEPLOY

- Selective backup of any content within the Content Store (packages, folders, reports, links, data sources, etc.)
- Partial or full restore of content to the original location or even to a new location (i.e. another user's My Folder)
- Deploy objects from one environment to another with simple drag-and-drop
- Move objects within the same environment through drag-and-drop
  ... all on demand or on a schedule!

### SECURE

- Integrated security
  - Support for unlimited security namespaces
  - Restrict software usage by Cognos secured capabilities
- Support for proxy servers and external single sign on (i.e. SiteMinder)
- Bulk security application/assignment to any object (reports, queries, data sources, links, portal pages, etc.)
- Search and replace object security
- Intuitive drag-and-drop interface for managing memberships and permissions
- Create groups and roles throuh flat file import
- Assign user memeberships through flat file import

### DOCUMENT

- Report on user access rights and memberships through the user interface or from MetaManager's packaged IBM Cognos reports
- Analyze a graphical view of the Content Store
- Create an integrated metadata environment by applying report screen tips
- Create data dictionaries from all of your Framework Manager models
- Contuct lightning fast serarches across a select-able group of reports for quick impact analysis
- Generate functional report specifications

## HOW WE STACK UP

| | Competition | BSP Software, an Avnet Company |
|---|---|---|
| Email, Web and Live Support on Competitive Offering | Limited | Yes |
| Implementation Services Across IBM Software Portfolio | No | Yes |
| Among IBM's Largest Distributors | No | Yes |

# Exhibit C

Friday, September 26, 2014

Register | Login



**BSP**Software

Home   Products   Support   Partnerships   News

Products » MetaManager » CompetitiveOverview » Company

## MetaManager
### COMPETITIVE TOUR

**Home**    Product Tour    Download    Pricing

**Company**   Overview   Update   Blast   Secure   Deploy   Document   Extend

### A Partner You Can Trust

Trust is defined as the firm belief in the reliability, truth, ability, or strength of someone or something. If you're going to partner with an organization and trust your environment into their product's hands, you want to know that the vendor will be around for the long haul. You want to feel comfortable knowing that the company has the financial means and the human capital to sustain the constant innovation that you expect!

### Roadmap and Vision

MetaManager was created out of implementation experiences, and over the many years since it's first release, our developers, consultants, and customers continue to innovate around this same concept. Implementation-Based Software© was the result. As you evaluate our existing product and talk to us about the active roadmap we have and will continue to sustain, you'll see that the competition simply can't keep pace! If you want to know their roadmap, just look at the hundreds of features MetaManager offers today. They have a long way to go! If you'd prefer to stay cutting-edge, we look forward to earning your business!



### How We Stack Up

In November 2012, BSP Software was acquired by Avnet, Inc., a Fortune Global 500 corporation and one of Fortune's Most Admired Companies for four years running! This marriage will enhance the depth and breadth of our IBM software and services capabilities, providing the expertise our customers need. As for our competitors. Well...

| | BSP Software, an Avnet Company | Competitor |
|---|---|---|
| Annual sales | $26 Billion | $2 Million |
| Employee headcount | 17,600 | 25 |
| Years since the competitive offering was first released | 7 | 3 |
| One of IBM's largest worldwide distributors | Yes | No |
| IBM software and related technology implementation services | | |
|   Data warehousing | Yes | No |
|   IBM Cognos implementation | Yes | No |
|   IBM Cognos public and custom training | Yes | No |
| Digital Strategy, Experience Design, Requirements Engineering, e-Commerce, Socialize the Enterprise, Portals and Collaboration | Yes | No |
| Web Content Management, Managed Services and Hosting, Cloud Computing, Mobile | Yes | No |
| Unparalleled email, web and live support on competitive offering | Yes | Limited |

*Company information obtained on February 1, 2013 from Hoovers.com and Dun & Bradstreet.*

**Competitive Tour**

**Skip to Trial**     Overview    Update    Blast    Secure    Deploy    Document    Extend

**Products**
- MetaManager for IBM Cognos BI
- MetaManager for TM1
- Integrated Control Suite
- CPM Explorer
- Security Migration
- BSP Mail Plus

**Free Stuff!**
- License Auditor
- PowerPlay Validator
- BSP Demo Provider

**Customer Support**
- Knowledgebase
- MetaManager Training
- ICS Training
- SMSS Training
- Downloads

**Resources**
- Podcasts
- Webinars
- COGNOiSe

**Contact Us**
Email Us

Case: 1:12-cv-02100 Document #: 263-1 Filed: 10/02/14 Page 138 of 138 PageID #:4292


    

Copyright 2014 Avnet BSP Software   |   Privacy Statement   |   Terms Of Use